MARGARET RYAN et al., Appellants, v. MARY E. RYAN.

Division One, April 1, 1903.

1. **Deed:** CONFIDENTIAL RELATION OF PARTIES.  A person is said to stand in a fiduciary relation to another when he has rights and powers which he is bound to exercise for the benefit of that other person.  And in this case it is held that the relation between an uncle and a niece, with whom the uncle boarded and to whom he conveyed a part of his property, was confidential.

2. ———: ———: INEBRIATE: TAKING ADVANTAGE OF CIRCUMSTANCES: WILL.  A grantor for more than twenty-five years was intemperate in the use of intoxicating drinks, and in his later years the habit grew beyond his control.  He would collect his rents and spend them all in dissipation, rendering his family no assistance.  When on a spree he would sell or pledge his tools and even his clothes for money;

to buy liquor. Within the last few years of his life he had several times been placed in the inebriate department of a hospital, and when he was brought a second time to another the sisters refused to take him, assigning as a reason that he was crazy and they were afraid of him. He was then taken to a brothers' hospital, and there confined in the inebriate ward until discharged as cured. He then went to live with defendant, his niece, who kept a boarding house. Later he again fell into such condition that she had him placed in this hospital, where he was confined for two weeks, and on the last day he made the deed conveying a part of his property to her, and there was testimony that he said that she had done a great deal for him by boarding and lodging him after he had been put out of his own home, and he intended this deed to pay her for what she had done for him. The testimony of his wife and children tended to show that some of them had been denied the right to see him after he had gone to live with his niece; other testimony tended to show that his niece had treated him kindly and taken good care of him. The deed which expressed a consideration of $5, was executed at the hospital, to which the niece, accompanied by a witness, went; and found the notary there with the deed already prepared, and it was executed in five minutes after their arrival. The witness testified that at the "time he had his perfect sense; there was nothing in his manner or conversation that was peculiar." One of the brothers at the hospital said he was "perfectly cognizant of what he was doing" and that he was discharged the next day as cured. *Held*, first, that the fact that the deed was made at the hospital where the niece had caused him to be placed, in accordance to a prearrangement, at a time when from his point of view her door was the only one open to him, is evidence that it was not his free act; second, the fact that four or five months previously she was instrumental in having him make a will by which he gave all his property to her, and had it executed by him and witnessed by others at a time when he was so drunk he did not know what he was doing as both witnesses swore when it was offered for probate, shows also that she was willing to use the condition of affairs to her own advantage.

Appeal from St. Louis City Circuit Court.—*Hon. Wm. Zachritz*, Judge.

Reversed and remanded (*with directions*).

*Alex. J. B. Garesche* for appellants.

(1)    Where a contract purports to be for a valuable consideration, evidence can not be introduced to

show that it was a gift or gratuity. Cadwallader v. West, 48 Mo. 497; Yosti v. Laughran, 49 Mo. 598. (2) Where confidential relations exist between the parties to a contract or wherever one person has acquired over another a position of superior influence or advantage by reason of relationship, trust, or confidence (whatever its origin), and business dealings occur between such parties, the court will require proof of the former, that the dealings were fair and honest in all respects on his part, under penalty of rescinding such dealings entirely. Freeland v. Eldridge, 19 Mo. 327; Cadwallader v. West, supra; Yosti v. Laughran, supra; Bradshaw v. Yates, 67 Mo. 228; McKinney v. Hensley, 74 Mo. 332; McClure v. Lewis, 72 Mo. 332; Kirschner v. Kirschner, 113 Mo. 296; Martin v. Baker, 135 Mo. 503; State v. Spears, 159 Mo. 518; Fitzpatrick v. Weber, 168 Mo. 562. (3) The court excluded the testimony of the defendant on objection of plaintiff, and rightfully so. Meier v. Thieman, 90 Mo. 441; Lins v. Lenhardt, 127 Mo. 289; Gunn v. Thruston, 130 Mo. 339; Angell v. Hester, 64 Mo. 144.

*Eugene McQuillin* for respondent.

(1) The burden is upon plaintiffs to establish the two essential allegations of the petition by a preponderance of evidence satisfactory to the court that Timothy Ryan was of unsound mind at the date the instrument was executed, or that he was unduly influenced by defendant, and therefore establish the ultimate conclusion that the instrument was not the free act and deed of Timothy Ryan. (2) This court will defer to the findings of the trial court even in equity cases, unless it is manifest that such findings are not sustained by the evidence, or are clearly against the evidence. In other words, the decree of the court should be sustained, unless clearly wrong. Taliaferro v. Evans, 150 Mo. 390. (3) The trial court

erred in excluding the testimony of defendant for all purposes. It was sought to be introduced merely for the purpose of impeaching and controverting certain statements made by other witnesses on matters having no relation to the execution of the deed in question. (4) The preponderance and probative force of the evidence is with the defendant, respondent herein; therefore the decree in favor of defendant should be affirmed. (5) The burden is not upon respondent to prove that the transaction was fair and honest in all respects on her part, since the evidence does not show that she acquired a position of superior or undue influence over her uncle by reason of relationship, trust or confidence.

VALLIANT, J.—Plaintiffs are the children and heirs of Timothy Ryan, deceased, and defendant is a niece of plaintiffs' father. The object of this suit is to set aside a deed made by Timothy Ryan a short while before his death to the defendant.

The statements of the petition, as grounds for the relief sought, are that the deed was made while the plaintiffs' father was in a weak and sickly condition and of unsound mind, resulting from habitual intoxication and while he was residing with and under the influence of the defendant, and that it was obtained by her through her undue influence over him.

The testimony for the plaintiffs was to the effect that their father for more than twenty-five years had been addicted to the intemperate use of intoxicating liquor, and that the habit grew worse as the years went on, so that in the last few years of his life it was beyond his control and he was an habitual drunkard. He had a little property from which he collected rents, about $30 a month, but he consumed it all in dissipation and gave his family no assistance from it. When on a spree he would sell or pledge his working tools

and. even his clothes for money with which to purchase liquor.

The only conflict in the evidence between the plaintiff and defendant on this point, if it amounted to a conflict, was as to the extent to which the deceased indulged the habit of drink or was controlled by it. That he was a man very much addicted to the habit, the testimony of defendant also showed. It was an undisputed fact that within the last few years of his life he had been four or five times placed in the inebriate department of St. John's Hospital, and in St. Mary's Asylum once, and when it was endeavored to place him in the latter institution again the sisters in charge refused to receive him on the ground that he was crazy and they were afraid to stay in the hospital with him. He was then taken to the Alexian Brothers' Hospital and confined in the inebriate ward and there treated for sometime and discharged as cured. That occurred in April, 1898. After leaving the hospital at that time he went to live with his niece, the defendant, who kept a boarding-house in the city.

There is some conflict in the evidence as to the cause of his leaving his own home and going to live with his niece; the evidence on the part of defendant on that point was to the effect that he said his wife and children beat him and drove him away, but their testimony was that they never treated him unkindly and did not drive him away. The plaintiffs' testimony also tended to show that they were not welcome to visit their father at the defendant's house and that once one of them was refused admittance.

In September, 1898, the unfortunate man again fell into such a condition that his niece, the defendant, with whom he was then living, took him to the Alexian Brothers' Hospital, and he was again placed in the ward for inebriates and remained there under treatment two weeks. It was on the last day of his confinement there and while he was yet in the hospital that

he executed the deed in question. He was discharged after executing the deed, either that day or the next.

It was agreed between the parties at the trial and so stated in open court, that the value of the property in question was $1,000 and that it was mortgaged for $600. The only consideration expressed on the face of the deed is five dollars. This was not the only property Ryan owned; there were three other lots, also incumbered and of about the same net value, which his wife and children have received.

The testimony as to what occurred at the execution of the deed was that the defendant in company with one of her witnesses, Mrs. Dahoney, went to the hospital and when they arrived the notary, who took the acknowledgment, was already there, the blank deed was filled out by the notary and it was signed and acknowledged by Timothy Ryan within five minutes after they arrived, Mrs. Dahoney signing it as a witness. There were present Mr. Dunn, one of the Alexian Brothers, the notary, Miss Ryan the defendant, and Mrs. Dahoney.

Mr. Dunn testified that Timothy Ryan was "perfectly cognizant of what he was doing" and that he was discharged as 'cured the next day. Mrs. Dahoney also testified that at that time "he had his perfect sense . . . there was nothing in his manner or conversation that was peculiar." There was also testimony for defendant to the effect that Ryan had said that his niece had done a great deal for him by boarding and lodging after he had been put out of his own home, and he intended this deed to pay her for what she had done for him. The testimony also tended to show that his niece treated him kindly and took care of him. After Ryan executed the deed and came out of the hospital he continued to collect the rents and appropriated the same to his own use and there was evidence tending to show that he warned the tenant, in Miss Ryan's presence, not to pay her the rent.

In April, 1898, while he was in his niece's house, Ryan executed a paper that purported to be his will, in which, after a legacy of one dollar to each of his children, he willed all of his estate to his niece. The witness who drew this document was a boarder at the time in Miss Ryan's house. This witness could not remember whether it was Mr. Ryan or Miss Ryan that first requested her to write it, but thought it was Miss Ryan. When this paper was offered for probate, however, after Ryan's death, it was rejected because both of the subscribing witnesses testified that at the time Ryan signed it he was so drunk he did not know what he was doing.

The circuit court found the issues for the defendant and rendered judgment accordingly, from which the plaintiffs appeal.

It is not essential to the establishment of the plaintiffs' case that they should prove that their father was actually bereft of his reason when he executed the deed. As long as a man has mental capacity enough to escape being placed under guardianship, after due inquiry, a court will not set aside his deed merely because he is mentally inferior to his adversary in the transaction and has been beaten in the bargain. The law expects men, not fit to be placed under guardianship, to take care of themselves. But this cold rule of law applies only where the relation between the parties to the transaction is not impressed with the character of trust and confidence reposed by the weaker in the stronger. By this is not meant a case in which the weaker may have trusted and confided when he had no right to trust and confide—when the parties were in fact dealing with each other at arm's length, but is meant a case in which the relation between the parties is such that the law gives to it a fiduciary character, one in which the weaker party not only may have in fact placed trust and confidence

in the other, but in which that other owed a duty to the confiding weaker one.

Learned writers on this subject while frequently specifying the relations of physician and patient, priest and communicant, lawyer and client, as examples of what the law deems a fiduciary relation, have been careful not to narrow the class so as to exclude other relations that ought to be embraced in it. [Cadwallader v. West, 48 Mo. 483.] The text-writer in 13 Am. and Eng. Ency. of Law (2 Ed.), page 11, says: "A person is said to stand in a fiduciary relation to another when he has rights and powers which he is bound to exercise for the benefit of that other person."

The main question therefore in this case is, did the defendant at the time this deed was executed stand in a relation towards the grantor that the law will denominate fiduciary? If she did, the burden is on her to show that the transaction was entirely fair and not constrained by her power over him.

That Ryan was in a most deplorable condition is shown by the evidence on both sides. That all of his misfortunes, as far as the record shows, were brought about by his habit of intoxication is very certain. Whether he was badly treated and driven from home by his wife and children, as the defendant's witnesses say he said he was, or whether he left there because he found he could indulge his habit with less reproach and mortification when out of sight of his wife and children, is immaterial—it was his evil habit that brought about that condition. Whether he was driven out or went of his own accord, the fact is he left his house and took refuge in the house of his niece. This niece was kind to him and no one has a right to say from anything that appears in this record that she would not have been just as kind to him as she was if he had been entirely without means. And it may be further said that if this deed had been executed under

circumstances which showed not only that the grantor knew what he was doing but also that he was a free man, acting by impulse of his own mind and that it was made in consideration of the care she had taken of him, it could not be successfully impeached on the ground of inadequacy of the consideration.

But the circumstances show that Ryan was not entirely free when he made this deed and that he was under the influence and within a measure in the power of his niece. Whether he was driven from home as defendant contends, or whether he left there for his own reasons, the fact is, his niece's door was the only one that from his point of view was open to him and if she should close it on him he would become an outcast indeed.

One of defendant's witnesses, a colored woman, testified that after he came out of the hospital he applied to rent a room in her house, but she refused because she considered it improper for a white man to live in a house with colored people.

Defendant had exercised sufficient authority over him to put him in the custody of the hospital people for treatment, and before he was discharged from that custody he signed the deed. There is no evidence that either entreaties or threats were used but his condition and the surroundings were such as could not fail to have had their influence. If it was a free act on his part, why was it planned to be performed before he was discharged? Why was it not postponed until he should have returned to the defendant's house? We say, planned to be performed, because, although there was no direct evidence of a prearrangement, yet the circumstances point to such. The defendant went there taking a witness who also became a witness to the deed; there they met with the notary, who had been summoned, the evidence does not show by whom; there was no parley, but the deed was drawn and signed within five minutes after their arrival. But

after he left the hospital he took care that the grantee in the deed should not collect the rent. He warned the tenant to pay the same to no one but himself. The defendant so far as shown never attempted during the life of her uncle to resist his collecting the rent, except that she demanded it of the tenant, but the tenant refused to pay it to her.

There is another fact that shows that the defendant was disposed to use the condition of affairs to her own advantage. She was instrumental in the making of the attempted will whereby she would have received all her uncle's property. She allowed that document to be signed by her uncle, requested the subscribing witnesses to attest it and they did so, when she knew and they all knew that he was so drunk he did not know what he was doing. That occurred four or five months before the deed was executed but it goes to show her influence and her disposition to use it.

The man may have been in his right mind when he signed the deed, but the circumstances under which it was executed falls far short of showing that it was his free act and deed.

The judgment is reversed and the cause remanded with directions to render a decree for the plaintiffs as prayed in their petition. All concur.