## GEORGE A. CORNET et al., Appellants, v. HENRY L. CORNET, Trustee, et al.

### Division One, February 28, 1915.

1. **PLEADING: Prayer.** The prayer of the bill may be resorted to for ascertaining the intention and meaning of the pleader, and to give color and character to the bill as a whole.

2. **———: Amendment: Prayer.** Where the bill states a good cause of action, the court, at the close of all the evidence, should grant plaintiff's request to amend its prayer for relief in accordance with the facts pleaded and the proof.

3. **WILL: Construction: Intention: In Light of Circumstances.** In construing a will the intention of the testator should never be lost sight of, and that intention should be gathered from reading the entire will in the light of the circumstances surrounding him at the time of its execution.

4. **———: ———: All Clauses.** A will should be so construed as to give full force and effect, if possible, to every paragraph thereof.

5. **———: ———: Unqualified Fee Simple: Subsequent Life Estate: Spendthrift Trust.** An unqualified fee simple estate created by one clause of the will in testator's wife and six children, and appointing one of them trustee to preserve the estate until an equal division can be made among them in kind, is not destroyed, or transformed into an estate for life, with remainder to the heirs at law of one of them, who is, at the time, greatly weakened and crippled by periodical drunkenness and improvidence, by a subsequent clause declaring that his share shall be placed in the hands of his brother for his benefit, who, as trustee, shall manage the trust fund, make it productive, and turn over the income to him during his life, and at his death the trust shall cease, and the fund shall go to his heirs at law. Nor did the subsequent clause have the effect to destroy the previously given unqualified estate by authorizing the trustee, in his option, instead of paying over to the devisee the income, to invest it in such manner as he might "deem most beneficial" to him.

   *Held*, by LAMM, J., concurring, that the language of the subsequent clause, being unfortunate and inexact or of doubtful import, cannot be held to cut down the unqualified estate granted by the preceding clause, and to create an irrevocable spendthrift trust with an income for the beneficiary optional with the named trustee.

6. ———: ———: **Subsequent Ambiguous Words.** Where the will in clear and unambiguous terms gives to a child an unqualified fee simple interest in a certain aliquot part of testator's estate, that interest is not reduced to a life estate by subsequent clauses ambiguous and uncertain in their meaning.

7. **DEED: Undue Influence: Confidential Relation: Presumption and Burden.** The presumption of law is that undue influence has been used by the grantee where a deed without consideration has been made by a devisee of an unqualified estate, placed by the will in the hands of a brother as trustee to be managed in his behalf, 'and whereby there is conveyed to said trustee the *corpus* of the estate during the life of the grantor, without any authority reserved to him to alienate · the same or to anticipate any of its income or usufruct. Where any close confidential or fiduciary relation is shown to exist between the grantor and grantee, and the grantor, in a weakened and depleted condition, mentally and physically, the result of excessive drink, makes such a conveyance, the presumption of law is that it was the result of undue influence exercised by the grantee, and the burden is on the grantee to show that such influence was not exercised, and in the absence of such a showing the conveyance will be held to be void.

8. ———: ———: ———: ———: **Nullifying Terms of Will by Trust Deed.** The third clause of the will unqualifiedly vested testator's property in his wife and six named children, authorizing one of them as trustee to take charge of the estate and preserve it until an equal division in kind could be made. The fifth clause placed "the share" of George in the hands of Henry "in trust for the benefit of said George," and required Henry "as such trustee to manage such trust fund, to make the same productive in such manner as he may deem most safe and advantageous," and to pay over to George the income thereof, less expenses, in quarterly installments. After the will was probated, Henry obtained a deed from George conveying to him the entire *corpus* of his estate, without any power reserved to George to anticipate the income or to control the sale or reinvestment of any part thereof, and with power in Henry to hold, manage and control the whole, except to pay the net income to George, during George's life, and at his death the balance remaining was to go to his descendants *per stirpes.* The conveyance also transferred to Henry any part of the property or estate of testator that George might thereafter acquire by descent or reversion. The conveyance or trust agreement was without consideration; and at the time it was made George was in a weakened and debilitated condition, physically and mentally, and had just come out of a hospital where for two weeks he had been treated for inebriety, into

which he periodically fell, and Henry says the trust agreement was made to clarify and fully carry out the purposes and meaning of the will, and to create a spendthrift trust in order that George might not waste or anticipate the income of his share of the estate. Henry was a successful business man, and George reposed trust and confidence in him. He had consulted a lawyer and had the instrument drawn, and when George called at his office to draw some money he signed it; at Henry's request, without an opportunity of prior disinterested advice. Henry told him it was a mere matter of form, to prohibit him from drawing money on his income when drinking, and being so assured he signed and acknowledged it without reading it. At that time George had not seen or read his father's will, and did not know its exact contents. Three of said six children died without issue, and after their death Henry obtained from George like instruments conveying his interest in their estates to himself. *Held*, that the trust agreements in effect nullified the will, and should be set aside as the result of fraud exercised by Henry, in taking advantage of the confidential relation and George's weakness, and in misrepresenting the character of the estate George took under the will and the purpose of the deed; and that Henry should be removed as trustee of George's property, and the chancellor directed to appoint a trustee to carry out the purposes of the will.

*Held*, by LAMM, J., concurring, that the deeds smack of personal advantage to the trustee, and their effect was to enlarge the terms of the will, and as the attitude of the trustee was in word and act cold and hostile to the beneficiary another should be appointed.

Appeal from St. Louis City Circuit Court.—*Hon. George C. Hitchcock*, Judge.

REVERSED AND REMANDED (*with directions*).

*Ryan & Thompson* for appellants.

(1)  Equity has jurisdiction to rescind an instrument, the execution of which has been procured through fraud, actual or constructive, or mistake of fact. Where a court of equity once acquires jurisdiction of the subject-matter and the parties, upon any recognized branch of equitable jurisprudence, it will retain jurisdiction until a complete disposition has been

made of the case. Barnard v. Keathley, 230 Mo. 224; Wehrs v. Sullivan, 217 Mo. 179; Reyburn v. Mitchell, 166 Mo. 365; Real Est. Sav. Inst. v. Collonious, 63 Mo. 295. (3) The jurisdiction of our circuit courts as courts of equity to construe the doubtful provisions of a will on application by a trustee named therein or by an executor or administrator acting thereunder or by any party or parties in interest, is undoubted. Davidson v. R. E. & Inv. Co., 226 Mo. 23; Heady v. Crouse, 203 Mo. 114; Clark v. Carter, 200 Mo. 515; Mersman v. Mersman, 136 Mo. 244; Hanner v. Cook, 118 Mo. 476; Bank v. Chambers, 96 Mo. 459; Church v. Robberman, 71 Mo. 326; Jameson v. Hay, 46 Mo. 546; Collier's Will, 40 Mo. 287; Lich v. Lich, 158 Mo. App. 400. The court should have admitted the oral testimony offered by plaintiff to prove the nature of the relations existing between the plaintiff and his father and the statements of his father as to the disposition he would make of his property. Tisdale v. Prather, 210 Mo. 402; Trustees v. May, 201 Mo. 369; Meiners v. Meiners, 179 Mo. 625; Webb v. Hayden, 166 Mo. 39. (5) The plaintiff under his father's will took an equitable fee simple estate in the property therein devised and bequeathed to him. Guy v. Mayer, 235 Mo. 390; Settle v. Shafer, 229 Mo. 561; Jackson v. Littell, 213 Mo. 589; Sevier v. Woodson, 205 Mo. 203; Gannon v. Pauk, 200 Mo. 75; Gannon v. Albright, 183 Mo. 238; Roberts v. Crume, 173 Mo. 572; Roth v. Rauschenbusch, 173 Mo. 582; Yocum v. Siler, 160 Mo. 281; Nichols v. Boswell, 103 Mo. 151; Small v. Field, 102 Mo. 104; Chew v. Keller, 100 Mo. 362. (6) The instrument of January 14, 1892, should be set aside and cancelled because (a): Of the relationship of the parties and the circumstances attending its execution. 2 White and Tudor's Leading Cases in Equity, p. 1156; Elliott v. Machine Co., 236 Mo. 567; Barnard v. Keathley, 230 Mo. 209; Bleyer v. Bleyer, 219 Mo. 99; Stevens v. De La Vaulx, 166 Mo.

20; Martin v. Baker, 135 Mo. 503; McClure v. Lewis, 72 Mo. 314; Miller v. Simonds, 72 Mo. 669; Garvin v. Williams, 44 Mo. 469; Clarkson v. Creely, 40 Mo. 114. (b). Its execution was secured through a mistake of law and fact. Clark v. Carter, 234 Mo. 90; Griffith v. Townley, 69 Mo. 13. The execution of this instrument was secured upon the assumption that the will created a spendthrift trust and empowered George Cornet as the beneficiary thereof to execute and make effective such an instrument as that of January 14, 1892, whereas the will created no spendthrift trust empowering the beneficiary thereof to create a trust such as was attempted to be created by the instrument of January 14, 1892. Heaton v. Trust Co., 153 Mo. App. 312; Kessner v. Phillips, 189 Mo. 515; Partridge v. Cavender, 96 Mo. 452; Lampert v. Haydel, 96 Mo. 439; Jarbo v. Hey, 122 Mo. 341; McIlvaine v. Smith, 42 Mo. 45; Sevier v. Woodson, 205 Mo. 203. (7) If George Cornet was by the will vested with an equitable title in fee, then the instrument of January 14, 1892, should be canceled and set aside, because (a) of the relation of the parties and the circumstances attending its execution; (b) mistake; and (c) he could not by this instrument create of such title the trusts in said instrument attempted to be created. See authorities supra; Bispham on Equity, secs. 20, 49 and 52; Adams on Equity, p. 62, sec. 38, and p. 180. (8) If George Cornet was by the will vested with an equitable life estate, then the instrument of January 14, 1892, should be set aside and canceled, because (a) of the relation of the parties and the circumstances attending its execution; (b) mistake; and (c) said instrument is violative of the terms of the will and the beneficiaries under said instrument would become trustees *maleficio*. Stevens v. De La-Vaulx, 166 Mo. 20; Ewing v. Shannahan, 113 Mo. 188; Elliott v. Machine Co., 236 Mo. 556.

Cornet v. Cornet.

*Luther Ely Smith* for respondents.

(1) This is not and cannot be regarded as a technical suit for the construction of a will. Church v. Robberson, 71 Mo. 326; Jarboe v. Hay, 122 Mo. 341; Gibson v. Gibson, 239 Mo. 490; 40 Cyc. 1846. Plaintiffs assert no immediate equity to entitle them to a construction of the will. All the questions discussed by plaintiff as to the construction of the will are speculative, and may never arise. State ex rel. v. Prewett, 20 Mo. 163; Strawn v. Trustees, 240 Ill. 111; Cross v. DeValle, 68 U. S. 1; Griggs v. Veghte, 47 N. J. Eq. 179; Teller's Estate, 215 Pa. St. 263; Bullard v. Chandler, 149 Mass. 532; Bullard v. Attorney-General, 153 Mass. 249; Hall v. Cogswell, 183 Mass. 521. (2) The instrument of January 14, 1892, was executed under circumstances showing *uberrima fides* on the part of each of the three persons concerned therein—George A. Cornet, Henry L. Cornet and Judge Muench. It was absolutely free from even the remotest suggestion of fraud or unfairness. Hatcher v. Hatcher, 139 Mo. 614. (3) The doctrine of mistake is not available to plaintiffs. (a) The facts completely demonstrate that there was no mistake. Copenhaver v. Copenhaver, 78 Mo. 55; Aull v. Day, 133 Mo. 337. (b) Plaintiffs' petition completely negatives the possibility of mistake, legal or actual. (c) Plaintiffs have not pleaded facts showing mistake. (d) Plaintiffs have not prayed relief on the ground of mistake. (e) Plaintiffs have, in this court, raised the issue of mistake for the first time. St. Louis v. Klausmeier, 212 Mo. 728; Burk v. Pence, 206 Mo. 335; Chapman v. Calahan, 66 Mo. 299; Ramsey v. Henderson, 91 Mo. 560; Kuhn v. Weil, 73 Mo. 213; Davis v. Bonds, 75 Mo. App. 32; Knoop v. Kelsey, 102 Mo. 291; Weil v. Posten, 77 Mo. 284; Walker v. Owen, 79 Mo. 563; Whetstone v. Shaw, 70 Mo. 575; McMerty v. Morrison, 62 Mo. 140; Dashiell v. Grovesnor, 66 Fed. 334; Lawence v. Lawrence, 181 Ill. 248. There was no mistake;

the deed is not voidable on any theory. Ashursts' Appeal, 77 Pa. St. 468; Heermans v. Schmaltz, 7 Fed. 566; Wright v. Miller, 8 N. Y. 9; Stone v. Hackett, 12 Gray, 227; Kelly v. Simon, 185 Mass. 288; Lawrence v. Lawrence, 181 Ill. 248; Massey v. Huntington, 118 Ill. 80; 21 Am. & Eng. Ency. Law (2 Ed.), 899; 39 Cyc. 36. (4) Plaintiff is entitled to the income for life, under item five of said will, and nothing more. Rutherford v. Greene, 2 Wheat. 196; Armor v. Frey, 226 Mo. 646; Cross v. Hoch, 149 Mo. 325; Dozier v. Dozier, 183 Mo. 137; Munro v. Collins, 95 Mo. 33; Schorr v. Carter, 120 Mo. 409; Morrison v. Thistle, 67 Mo. 596; Bean v. Kenmuir, 86 Mo. 666; Gibson v. Gibson, 239 Mo. 494; Threlkeld v. Threlkeld, 238 Mo. 459; Jarboe v. Hay, 122 Mo. 341. (5) Plaintiffs' cause of action, if any, is barred by: (a) Acquiescence. (b) Laches. Taylor v. Short, 107 Mo. 384; Thiemann v. Heinze, 120 Mo. 630; Hatcher v. Hatcher, 139 Mo. 614. (c) The Statute of Limitations. Secs. 1888 and 1889, R. S. 1909; Hoester v. Sammelman, 101 Mo. 619; Stark v. Zehnder, 204 Mo. 442. (6) The amendment proposed by plaintiffs at the end of the whole case was a matter clearly within the sound discretion of the chancellor. It would have been an abuse of discretion to have permitted it. Wilkerson v. Sampson, 56 Mo. App. 276; Singer Mfg. Co. v. Givens, 35 Mo. App. 602; Ensworth v. Barton, 67 Mo. 622. (7) Plaintiffs' evidence which was excluded, both oral and documentary, was wholly irrelevant, immaterial and incompetent. Roberts v. Crume, 173 Mo. 572; Garth v. Garth, 139 Mo. 456; Mersman v. Mersman, 136 Mo. 244; Massey v. Huntington, 118 Ill. 80. (8) No facts were shown justifying the granting of the prayers for accounting, removal of trustee, requiring trustee to give bond, etc.

WOODSON, P. J.—This is a bill in equity, asking for a construction of the will of Francis Cornet, deceased, and for the cancellation of a certain deed exe-

cuted January 14th, 1892, by the plaintiff, George A.
Cornet, to the defendant, Henry L. Cornet.

Since the bill is quite lengthy, covering fourteen
printed pages, we will content ourselves by briefly
stating the substance of it.

The bill in substance charges that Francis Cornet
died testate in the city of St. Louis on December 20th,
1891, seized and possessed of certain real estate and
personal property worth about $235,000; that said
will was duly probated in the probate court of the
city of St. Louis, Missouri; that the deceased left
surviving him, his widow, Julia Cornet, and the
following six children: George A. and Henry L.
Cornet, the plaintiff and defendant, John Fred, Ida,
William and Isabella Cornet, now the wife of Alexan-
der Henneman. That since the death of the testator,
Ida, William and John Fred Cornet have departed
this life.

That by item one of the will the widow was given
certain personal property, together with a life estate
in certain real estate described, in lieu
The Will.    of dower, and upon her death the same
was given to the testator's children or
their heirs in equal parts.

That item two made certain bequests to certain
charitable institutions, which are unimportant in this
case.

That items three, four and five of the will are in
the following words and figures:

"Item 3. All balance and residue of my property,
be it real, personal, or mixed, stocks, bonds and chat-
tels, I will, give, bequeath and devise to my said beloved
wife and aforenamed children in equal shares, to be
divided among them in kind or the same may be sold
as they may deem most advantageous or as may be
agreed upon by them, and for the purpose of preserva-
tion of the property until a division is made, I appoint
my said son Henry L. Cornet, trustee; he shall take

charge of all my real estate except that as described in item 1, until a division is had; he shall account for all income and disbursements for keeping in repair the same and pay over from the net proceeds after charging a reasonable compensation, for his services, to my said wife and aforenamed children in equal shares, quarterly.

"Item 4. All my personal property, stocks and bonds, except as in Item 1, after all my debts and legacies are paid, shall as soon as can be conveniently done, be divided among my wife and children in kind, as nearly as can be, in equal shares, until such division is made, my said trustee shall account for the income thereof, as hereinbefore stated and my said trustee shall give no bond as such.

"Item 5. The share going to my said son, George A. Cornet, be it real or personal property, shall be placed in the hands of my said son Henry L. Cornet, in trust for the benefit of said George A. Cornet, he, the said Henry L. Cornet, as such trustee, to manage such trust fund, and to make the same productive in such manner as he may deem most safe and advantageous and the income thereof, after deducting the necessary expenses and a reasonable compensation for his services to either pay over to the said George A. Cornet in quarterly installments, or at his, said trustee's option, to lay it out in such manner as he deem most beneficial to said George A. Cornet, and after the decease of George A. Cornet, said trust fund shall go to his heirs in law and thereupon the trust shall cease. My son Henry L. Cornet shall not be required to give security for the faithful execution of the trust.

"If any of my children die leaving issue, such issue shall inherit their parent's part.

"I nominate, constitute and appoint my beloved wife, Julia Cornet, and my son Henry L. Cornet, executors of this will, without giving bond.

"Witness my hand and seal this thirty-first day of January, 1891."

**Petition.** The bill further states that under the will the plaintiff is entitled to one-seventh part of the testator's estate, and that Henry L. Cornet, the defendant, a brother of the plaintiff, was the active executor, as well as trustee *ad interim,* under the will, and that he had and entertained the fullest and most complete fraternal trust and confidence of the plaintiff, who was in a weakened and depleted physical and mental condition; that under those conditions and circumstances, in order to obtain for himself and the other children of Francis Cornet, the title to the real and personal property devised and bequeathed to the plaintiff, Henry L. Cornet, the defendant designedly appeared to take an unusual interest in the welfare of George and represented to him that he, George, was disinherited by his father's will except a living and only such as he, Henry, saw fit and proper to give him, and that in order to further protect his slender interest in his father's estate, he, George, should sign a paper which he, Henry, had caused to be drawn by his lawyer, without the knowledge of the plaintiff.

That on January 14th, 1892, Henry procured the signature and acknowledgment of George to said paper without giving him an opportunity to obtain legal advice upon the false representations the defendant made to him regarding his interest in the estate under his father's will, namely, that he, Henry, was vested with the estate in trust which was willed to George with remainder over to George's heirs by blood or *per stirpes,* and that he, George, had no rights under the will that he could alienate or control.

The petition then states that said deed of January 14th, 1892, was without consideration, was fraudulently obtained, and was void. Then follows a statement of the substantial provisions of said deed. For conven-

ience we here copy said deed in full, which is as follows, omitting formal parts:

"This indenture made and entered into this 14th day of January eighteen hundred and ninety-two (1892) by and between George A. Cornet (single) of the city of St. Louis, State of Missouri, party of the first part, and Henry L. Cornet as trustee, for the purposes hereinafter mentioned, of the same place, party of the second part, witnesseth: That in consideration of the sum of one dollar to him in hand paid by said party of the second part receipt whereof is hereby acknowledged as well as in consideration of the uses and trusts hereinafter specifically set forth the said party of the first part, has granted, sold, conveyed and transferred and hereby does grant, sell, convey and transfer unto the said party of the second part all right, title and interest of said party of the first part in and to all the lands, tenements and hereditaments of Francis Cornet lately deceased, whether the said lands, tenements and hereditaments be situated in the city of St. Louis, State of Missouri, or elsewhere in said State of Missouri, or in the State of Illinois, whether such right, title or interest be present or in expectancy or reversion, as well as all other estate or property whether personal or mixed of the said party of the first part, derived from or to which he may be entitled under the last will of said Francis Cornet, deceased, and all increase interest or accumulations thereof. To have and to hold the same unto the said Henry L. Cornet, his heirs and legal representatives or successors in trust forever.

"In trust, however, for the uses and purposes following, to-wit: Whereas in and by the last will and testament of Francis Cornet, deceased, duly probated in said city of St. Louis, it was intended that all the property aforesaid should pass to and be held by the party of the second part herein in trust for the beneficial use of the party of the first part without power

<span style="margin">Trust Deed.</span>

of alienation or anticipation in the party of the first part for and during his natural life, with remainder over to his heirs at law, and so that said party of the first part should be without power to alienate any of said property or to anticipate, charge or convey the rents, incomes or profits thereof. Now, therefore, in order to fully carry out and give effect to the purposes and intentions of said Francis Cornet deceased, as in and by said will indicated, and for the purpose of fully and effectually defining and declaring the trust, so by said testator created and by the parties hereto accepted, it is hereby covenanted as follows to-wit: That the said party of the second part shall fully take charge of, hold, manage and control any and all the estate, property or interest, whether real or personal, that may now be or compose the share of said George A. Cornet in the estate of said Francis Cornet deceased, or that may hereafter become such either by descent, reversion or otherwise; that the said party of the second part shall collect and receive all rents, incomes or profits at any time or in any manner arising therefrom, and out of the same he shall first pay and discharge all proper charges or expenses upon any part of the share of said estate, including usual compensation to him as such trustee, and the net balance of said income or profits he shall pay over to the party of the first part in quarterly installments or at such time and in such amounts as to him may seem most beneficial to the party of the first part for and during the natural life of the said party of the first part, without power, however, in said party of the first part to in any manner alienate, dispose of, anticipate or charge either the principal or any part of the income of said property, in any manner whatsoever, and upon the death of said party of the first part the trust hereby defined and imposed shall cease, and the property aforesaid shall by said party of the second part or his successor in trust be equally divided among the heirs at law of said party

of the first part *per stirpes,* and the said party of the second part and his successors in trust are hereby authorized to sell, alien and convey any part of the property and estate hereby conveyed and to make full and perfect title or delivery thereof to the purchaser on such terms and at such prices as to him shall appear proper, and the proceeds of any such sale or transfer he shall again invest in good real estate or bonded security to be held, controlled and managed in the same manner and upon the same powers and trusts herein prescribed with reference to the original estate, and the said party of the first part expressly releases and waives all rights under and by virtue of the homestead exemption laws of the State of Illinois in and to all the property aforesaid which may be located in said State of Illinois. It is further covenanted that in the event of the death or the refusal or inability of said party of the second part to further act as such trustee any court exercising chancery powers, and having jurisdiction over the property herein conveyed, may appoint a successor of said party of the second part, who shall thereupon be invested with all the powers, duties and responsibilities, in any way by this deed imposed, upon said party of the second part.

"In testimony of all of which the said party of the first part has hereunto set his hand and seal at the City of St. Louis, the day and year aforesaid."

The bill further charges that the defendant is in possession of all the property devised to him by said will, including that given to the plaintiff, and that he manages and controls the same without permitting the plaintiff to have a voice in connection therewith. That when the deed of January 14, 1892, was executed, plaintiff erroneously believed the representations of the defendant, that he, the plaintiff, had no estate of his own under his father's will, and for a long time he sought no legal advice because of his brother's repeated assurances that he had no estate

*Petition.*

under the will. That for many years past, the defendant has manifested ill-feelings toward the plaintiff, has ignored his requests for information, and all his efforts to counsel with him regarding his affairs have been refused, and his treatment of plaintiff has been so harsh and contemptuous as to make it impossible for him to approach the defendant, to discuss his said matters. That by the deed of January 14, 1892, it was wrongfully sought to deprive plaintiff's wife of her marital rights in and tŏ the property devised to him by his father's will.

The prayer of the bill is as follows:

"Wherefore plaintiffs pray that it be decreed by this Honorable Court herein that said plaintiff, George A. Cornet, was entitled under the said will of Francis Cornet, deceased, to appoint and dispose of his estate thereunder, and as well of the subjects of the trust of said deed of settlement or indenture between him and the said Henry L. Cornet, trustee, and, as their interest may appear therein, of the said Henry L. Cornet, and Isabella Henneman, of date the 14th day of January, 1892, as he, said George A. Cornet may deem proper in priority to and in disregard of the trusts and limitations or remainders to said last named defendants or their heirs who may stand or may be within the *per stirpes* class, of succession under the laws of this State.

"And that the said deed of settlement, dated January 14, 1892, between the parties hereto, be declared invalid and for naught held and of no further force and effect, and that the same be canceled and declared void.

"That an account be taken of all and every the said trust property and effects which have been received by said Henry L. Cornet for or in behalf of said George A. Cornet, as also an account of his application thereof, and the said Henry L. Cornet may be decreed to turn over and pay to said George A. Cornet what

shall appear to be due from him, said Henry L. Cornet, in the premises.

"Or in the alternative, that said instrument of January 14, 1892, be declared void and an accounting be ordered as above prayed, and that the court construing said will shall declare that the plaintiff, George A. Cornet, is entitled to appoint and dispose of the property hereinbefore mentioned, to such persons and for such estates as to him shall seem fit, and that the same is subject to the dower and other marital rights of his said wife under the laws and statutes of this State, and that in any event, said Henry L. Cornet be removed as such trustee, and any future nomination of a trustee shall not be made without his, George A. Cornet's, consent and approbation, or that of his said wife, and that the plaintiffs may have such other, further and necessary relief and redress in the premises as the nature of the case may require, and which to the court may appear to be just and proper."

The substance of the answer is fully stated in the following language, taken from respondent's statement of the case, viz.:

**Answer.**

"The answer admitted relationships, deaths, probate of will, and other undisputed facts, averred that the instrument of January 14, 1892, was executed by George as his own free act and deed and was duly acknowledged by him as such, and in full recognition of the terms and provisions of said will of Francis Cornet; that in and by said deed George fully accepted, ratified and subscribed to all the terms and conditions of the said will of Francis Cornet, as giving him only the net income from the share left to Henry in trust for George, and appointed Henry L. his trustee to collect the income from said property and pay it over to George, and upon George's death, said property should be equally divided among his heirs; that George by the instrument of November 11, 1893, with reference to Ida's estate, joined in requesting that his share

of the estate be held by Henry on the same terms as contained in the instrument of January 14, 1892, and that William J. by his will left George's share of the estate to Henry L. in trust upon the same terms as in the instrument of January 14, 1892.

"The answer contained a general denial of all further allegations in the petition, and by way of affirmative averment set up items 3 and 5 of said will, alleged that in and by the said fifth item Henry was specifically charged with the duty of managing .said trust fund and making it productive in such manner as he might deem most safe and advantageous, and the net income to pay over to George, in quarterly installments, or to lay it out in such manner as he (Henry L.) might deem most beneficial to George; and that after George's decease, said trust fund should go to his heirs at law, and thereupon the trust should cease.

"That thereafter George fully recognized said provisions in said will, by freely executing said instrument of January 14, 1892, and ratified and acquiesced in the conditions imposed by said Francis in said will, that he (George) should have no legal title to said property and no power of alienation or anticipation over or upon the said trust estate, and that he should enjoy only the beneficial use, and during his natural life only, with remainder over to his heirs at law, without power to alienate any of said property or to anticipate, charge or convey the rents, income or profits thereof; that said instrument was executed by George for the purpose of carrying out and giving effect to the purposes and intention of Francis, and for the purpose of fully and effectually declaring said trust; that Henry L. accepted said trust and ever since has faithfully discharged his duties as trustee and still continues so to do; that at all times until a recent date, George A. has recognized, acquiesced in, ratified and accepted the terms and conditions of said bequest and of said conveyance of January 14, 1892; that by the instrument of November 11,

1893, with reference to Ida's estate, and a later instrument with reference to William J.'s estate, George recognized and ratified said instrument of January 14, 1892; that defendants continuously have been, and for a long time George himself was, apprehensive lest he (George) would waste and improvidently spend any and all property that might come into his hands; that to protect George and preserve him from want and to insure George the enjoyment of the income coming to him, Henry accepted and assumed the duties of trustee under said will and instrument of January 14, 1892, and joined in the execution of said instruments with reference to Ida's and William J.'s estates, respectively; and has faithfully discharged his duties as trustee under items 3 and 4 as well; has not taken compensation as trustee of George, though entitled so to do; has faithfully accounted to George in quarterly statements, all of which quarterly statements have been received and accepted by George and retained by him without disapproval, complaint or question.

"That plaintiffs have been guilty of laches and this bill is without equity; that plaintiff's cause of action, if any, with reference to the instrument of January 14, 1892, is barred by the five-year and the ten-year Statute of Limitations."

The reply was a general denial "of each and every allegation of said answer."

The evidence for the plaintiffs tended to show that Francis Cornet died testate in the city of St. Louis on December 20, 1891, seized and possessed of the property previously mentioned, and that he left surviving him his widow and children before mentioned. That prior to his death, he duly executed and published the will before mentioned and that the same was duly probated in the probate court of the city of St. Louis, as charged in the bill.

That since his demise and prior to the trial of this

**Facts.**

cause, Ida, John Fred and William J. Cornet departed this life, single and unmarried.

That on January 14, 1892, the plaintiff executed the deed to Henry L. Cornet, hereinbefore copied, which was duly filed for record and recorded in the office of the recorder of deeds of the city of St. Louis.

That with the exception that Isabella Henneman had conveyed her interest to her mother, Julia Cornet, there had been no change in the title to the property at 3646 Washington Avenue (mentioned in item 1 of the will) since the demise of Francis Cornet; that the value of the estate of the testator was about $200,000, and that the interest, whatever it may be, that the defendant is holding as trustee for the plaintiff, is worth about $33,000, and that the assets on hand January 1st, 1909, which the defendant claimed the right to hold as plaintiff's trustee, were worth $34,357.15.

George A. Cornet testified in substance, in his own behalf, as follows:

That he was fifty-six years of age, and that his father died December 20th, 1891, at the age of seventy-one years. That during his last illness he was confined to his room and bed about two weeks, and that witness nursed him the last eleven days of his sickness.

Plaintiff offered to prove "that the relation between George, the plaintiff, and his father, Francis, deceased, were of the most cordial and affectionate kind; that he nursed his father through his last illness, at his father's request; that his father had not only affection for and confidence in George, but that he repeatedly said to him that he, George, was going to get the same share in his estate that the other children would get." That he was not married at the time of his father's death, but with the knowledge of his father, he was keeping company, in contemplation of marriage, with Tillie Klock, and was and had been engaged to her about five years at that time, and subsequently married her on July 1, 1896. That plaintiff offered to

show that prior to the execution of the deed of January 14, 1892, defendant knew that plaintiff was going to marry Tillie Klock, and that "it was a matter of common family knowledge in the Cornet family," but this evidence was excluded on objection of defendant.

As to the deed of January 14, 1892, he testified that after his father's death, he and his uncle went around to see people in North St. Louis, and visited many saloons and drank liquor therein, after which he went to St. Vincent's Institution to rest. That he stayed there about two weeks, having gone there a day or two after Christmas, 1891. That from St. Vincent's he went to the defendant's office to draw some money, when he, Henry, handed him the deed of January 14, 1892, and requested him to sign it and said, "It was a mere matter of form." That he did not read it or know its contents, but asked Henry, the defendant, "What is it?" and he said, "It is a mere matter of form, so that you cannot borrow money on your income." In reply, witness said, "If that is it, I will sign it." And that he did so.

That he had not been consulted by Henry prior to that time in regard to his execution of said deed, nor had the plaintiff consulted any lawyer about it, nor did he know of its existence until he went to Henry's office as previously stated. That he had been at St. Vincent's ever since the funeral of the testator. That the deed was signed and acknowledged in the office of the defendant. That he was not in said office more than twenty or thirty minutes. That defendant said, "It is just a matter of form that you have to sign," and witness said, "What does it mean?" He said, "So that you will not loan money on your income." "Well," I says, "I would do that." He said, "Sign it," and I did so.

That he signed and acknowledged the deed, but that no consideration whatever was paid him for so doing.

On cross-examination George stated that he talked with no lawyer about the instrument of January 14, 1892, and did not go with Henry to see any lawyer—that he didn't understand the effect of the instrument, and they never explained it to him; that in 1895 Judge Woerner gave him (George) a copy of this deed, took him to the Recorder's office, and Henry gave him a copy of the deed and he (George) took it; he (George) consulted Judge Woerner about the will and he referred him to the Judge's son.

When he signed the instrument of November 11, 1893 (with reference to Ida's estate), he was in his right mind and had not recently returned from St. Vincent's or any other hospital, the other members of the family were present, and he just signed it without reading it. Said instrument contains the following clause:

"And, lastly, all the residue of said personal estate shall be divided in exactly equal proportions between all the undersigned heirs of said Ida M. Cornet, without regard to the question as to whether the same were related to her by the full blood or by the half blood; provided, however, that the proportion so accruing to the undersigned George A. Cornet shall be delivered to, held and administered by said Henry L. Cornet as trustee, subject to all the powers, conditions and stipulations contained in a certain trust agreement heretofore entered into between said two parties, dated January 14, 1892, and recorded in the Recorder's office of the city of St. Louis, in Book 1050, page 509."

That he signed the agreement with reference to his brother William J.'s estate, dated March 22, 1900, mentioned in the answer. He knew it was another inheritance; he was in California in 1900 and supposes the paper came to him through the mails; he signed without reading it. Henry was doing all the business for them and he trusted Henry. Said instrument recites the terms of the will of William J. and contains specific

reference to the instrument of January 14, 1892, in substance as abstracted by plaintiffs, as follows:

"That whereas William J. Cornet, by his will of December 11, 1893, duly probated, made certain bequests, to-wit, thirteen in number, religious and charitable, and aggregating eight thousand five hundred and recites the subsequent parts of the will, whereby said Cornet bequeathed to his mother, Julia, and his sister, Isabella, and his brothers, George, John F. and Henry L., each an equal part of all his property, real, personal or mixed, then possessed or thereafter acquired, on condition that the share going to George, whether real or personal, should be placed in the hands of Henry as trustee for the use and benefit of George, upon the same trusts, conditions and directions in all respects as set forth in the indenture and declaration of trust of January 14, 1892."

Mrs. Cornet, Senior's, signature appears first, Mrs. Henneman's second and George's third to said instrument of March 22, 1900, with reference to William J.'s estate.

The plaintiff offered much additional evidence, which was excluded by the court on objection of defendant, which may be noticed presently.

E. V. P. Schneiderhahn, a member of the St. Louis bar, stated that he was related to the parties to the suit. In the latter part of 1906, he was consulted by plaintiff, George, "and the matter was put to him for thorough examination." He was to examine into the several estates of the beneficiaries, and the instrument of January 14, 1892, and ascertain the rights of George in respect to the power of disposition on his part and the rights of his wife should she survive him. Witness had no reason to believe that, before that time, plaintiffs were advised as fully as he afterwards advised them. Witness made an extended examination and gave his advice to plaintiffs in the latter part of 1907. He gave them no final opinion as to their rights under the will

and deed of January 14, 1892, for a year after they first consulted him. About the spring of 1907, witness expressed doubts as to George's right of disposition and that his wife would be entitled to take anything should she survive him under the terms "heirs at law." Witness prepared the agreement offered in evidence in connection with the testimony of George Cornet (excluded) and got the consent of all except Henry to his signature.

Mrs. Tillie Cornet testified that she was married to the plaintiff, George, July 1, 1896. When she and her husband went to consult Mr. Schneiderhahn "that was the first time she had heard her husband did not have anything. She knew nothing about the deed." Prior to her marriage, she had not discussed with the defendant Henry her husband's interests or property rights. She did not know defendant, Henry, before marriage. She did not inform him of her intended marriage with his brother.

Hugo Muench, Judge Division No. 1 of the circuit court, testified: that before he went on the bench he was consulted by Henry L. Cornet regarding the will of Francis Cornet, deceased, especially as to the character of the estate it gave to George A. Cornet, and that he drew the deed of January 14, 1892, conveying George's interest therein to Henry as trustee. He did not recall having seen Mr. George Cornet more than once, and that interview was preceded by a call by Henry, who was a client of his firm (Lubke & Muench), which took place a day or longer before, and after that conference Henry brought George to witness's office and they had a conversation about the proposed paper (instrument of January 14, 1892). Witness was not certain whether at that time he had drafted the paper. He identified the instrument of January 14, 1892, as being the instrument to which he referred. He drafted it. The purpose of it was explained to George, but whether it had been drawn afterward witness is not certain. George

stated he wanted such a paper. Being shown the instrument of January 14, 1892, witness stated that the only feature he remembered was ''the feature by which it was either successfully or unsuccessfully intended to create what (witness) designated at the time as a 'spendthrift trust.' That feature was discussed with Mr. Cornet and the statement made by Henry in his (witness's) presence and assented to by him (George); that is to say, he (George) stated that was what he wanted; that his habits were such that he was afraid of himself; that he would be afraid that he might be induced to sign away things or spend his money recklessly when under the influence of strong drink, which unfortunately had at that time taken possession of him, and that feature of it he (witness) remembered distinctly being discussed.'' Witness further explained to George that he, witness, did not think that under the will ''the terms were stringent enough,'' which he (witness) understood; and (witness) tried to explain this to be a spendthrift trust. Witness did not see George again after that interview.

On cross-examination: Witness was uncertain whether this talk with George took place prior to the drafting of the instrument or subsequently. It was quite as likely that he drew it after. Before the interview with George and Henry together, witness had conferred with Henry about drafting the instrument. Witness stated that in drawing the instrument of January 14, 1892, he ''endeavored not to upset anything that might have been said in the will, or any rights that Mr. Cornet got under the will. Their object was to further provide Mr. Cornet against his own weakness. We drew the instrument more as a matter of abundant precaution than anything else. Mr. Cornet had doubts, and I had doubts, whether or not under that section of the will that you have referred to—I believe it is 5— there was really a 'spendthrift trust' created, although to my mind it conveyed an intention on the part of the

testator to protect his son against any eventualities of the kind, any weakness of his; and in order to make that matter, if possible, stronger—to put it where it might be more effective if possible—the instrument was drawn.''

Witness had no recollection why he had used the words *''per stirpes''* in the instrument of January 14, 1892, but had no doubt that he had a purpose in using them.

''It was only a few days between Henry's first visit and his visit with George. He has some faint recollection of hearing of George having been in the hospital at one time but does not recollect that George came with his brother to the office from the hospital. He had no recollection that George had been and still was at the hospital as a result both of an injury and perhaps also of his unfortunate habit. Witness did have a faint recollection of hearing he had been or at one time was in the hospital but the reasons for it he did not remember; nor could he remember in what connection he had learned this.'' Witness was trying, as he recalled it, to secure George as to his own property interests against his own improvidence and habits.

Henry L. Cornet testified in his own behalf as follows: I engaged in the real estate business in St. Louis twenty-eight years. Knew plaintiff Tillie about three months prior to her marriage with George. Prior to 1896, witness knew nothing of any contemplated marriage.

As to the instrument of January 14, 1892: I, knowing his habits as well as I did, and having previous experience with cases similar to it, I thought it would be well to take all due precaution against having any bills or claims sent to the office that he may have given on the outside against the income which was to accrue from this trust fund; and I was not quite clear in my own mind, from reading the will, as to whether or not it empowered me sufficiently. I took it up to

Judge Muench's office; or, in the first place, I went to his office and spoke to him on the subject, what I was trying, in advance, to avoid. He said to bring up the will and he would look it over and he then suggested some sort of document along the lines covered by this instrument. And in a day or two I brought up the will and he called me up shortly afterwards and said that he suggested my bringing in the brother—George—and seeing whether he would be satisfied about signing a document of that kind. So as to overcome that particular point—that is, as to protecting myself against having these orders sent in on me, I did that.''

Witness visited Judge Muench with George. The instrument had not then been prepared. Judge Muench stated to George that, although in his opinion he thought the will probably was sufficient to cover the point of witness being able to prevent any judgment or liens on George's income, to avoid any question, a paper could be drawn up which would entirely eliminate the doubt.

Witness requested the Judge to draw up such a paper. He called for it in a couple of weeks or ten days and had it in his office the first time George came in ''and I told him that that was a document drawn on the line that we had discussed in Judge Muench's office and he could sign it. So then I sent out or went out and got Mr. Chapmen, who was then in a nearby office, to take the acknowledgment after he signed it; and that was the end of it.''

On cross-examination: Witness had heard of the plaintiff, Tillie Cornet, for perhaps five to seven years prior to her marriage with George. Asked if following their father's death, George was not for several weeks in the Mullanphy Hospital, witness said it had occurred so often he could not recall the various times and did not know as to that special time, and did not recall that he got George to come from the hospital to go with him to the office of Lubke & Muench, and does

not know whether George at that time was in a seriously depleted physical and mental condition, consequent upon excesses and upon an accident. Does not say these things were not so, but simply not to his knowledge. Does not recall whether George's condition was as indicated by counsel.

Could not say whether George read the instrument of January 14, 1892, or not; does not think he read it to him or went over it with him. Being asked if he claimed to be handling George's estate under the will of their father or under the instrument of January 14, 1892, objection was interposed by the defendant, which was sustained by the court, the court stating: "My view of the subject was that he must necessarily act under the will, in respect to that property; and the instrument of January 14, 1892, was absolutely inoperative or void in so far as it attempted to control or dispose of the property which came to Mr. Cornet as trustee under the 5th item of the will." No consideration was given for the instrument.

On rebuttal: Defendant, Isabelle Henneman, was placed upon the stand by the plaintiff and was asked whether or not, so far as her interest as a daughter of Francis Cornet was concerned, she had any objection to her brother having his estate and if she had any objection to his wife having her interest as a wife in such property. An objection was made and sustained.

At the conclusion of all of the testimony, plaintiff's counsel then stated: "I ask leave to amend the petition alleging that George A. Cornet had under this will an equitable estate, in fee simple, and ask that the court so construe the will."

The Court: "The application will be denied."

To this ruling the plaintiffs duly excepted, as they did to all adverse rulings heretofore noted.

The court found for the defendants, and entered a decree accordingly. In due time and in proper form

plaintiffs filed their motion for a new trial, which was by the court overruled, and plaintiffs duly excepted. After taking the proper preliminary steps, the plaintiffs appealed the cause to this court; and have assigned the following errors:

"1. The court erred in not entering a proper decree.

"2. The court erred in refusing the plaintiffs' request, at the conclusion of all the testimony, for leave to amend their petition so as to allege therein that George A. Cornet had, under the will, an equitable estate in fee simple and to pray that the court so construe the will.

"3. The court erred in refusing to cancel the instrument of January 14, 1892.

"4. The court erred in not construing the will of Francis Cornet.

"5. The court erred in excluding testimony to show the relations existing between the plaintiff, George A. Cornet, and the testator, Francis Cornet."

I. The assignments of error present numerous questions for determination, and in logical order we should first dispose of the one which complains of the action of the trial court in refusing appellants, at the close of the introduction of the evidence, permission to amend their bill or petition.

Because of the great length of the petition, we have seen proper to state the substance of it instead of copying it in full, in the statement of the case; and by reading the petition thus condensed, it will be seen that pleader attempted to state facts which would warrant a construction of the will and a cancellation of the deed of January 14, 1892, made by George Cornet to Henry L. Cornet. And by reading the prayer of the bill, which is copied in the statement of the case, it will be seen

<span>Amending Bill.</span>

that the pleader expressly asks for a construction of the will and a cancellation of said deed.

While it is true, the prayer of the bill, technically speaking, constitutes no part of the bill proper, yet

**Prayer.** even when the charging part thereof is doubtful and uncertain in meaning, I see no good reason for holding that the prayer may not be resorted to for the purpose of throwing light upon the intention of the pleader, and give color and character to the bill, especially where all the facts of the case are so fully stated as they are in this case.

These views find support in sections 1756 and 1794, Revised Statutes 1909.

The former section provides that suits may be instituted ''by filing in the office of the clerk of the proper court a petition setting forth the plaintiff's cause or causes of action, and the remedy sought,'' etc.; and the latter provides that: ''The first pleading on the part of the plaintiff is the petition, which shall contain: First, the title of the cause, specifying the term, the name of the court and county in which the action is brought, and the names of the parties to the action, plaintiffs and defendants; second, a plain and concise statement of the facts constituting a cause of action, without unnecessary repetition; third, a demand of the relief to which the plaintiff may suppose himself entitled. If the recovery of money be demanded, the amount thereof shall be stated, or such facts as will enable the defendant and the court to ascertain the amount demanded.''

These sections of the statute expressly require that the facts of the case be stated, and that the pleader must state the relief which he may suppose he is entitled to, based thereon.

The prayer is the corollary of and is necessarily predicated upon the facts stated, and shows clearly what the pleader had in mind and what he was undertaking to state. All of those matters appearing upon

the face of the bill, the defendants could not fail to see them and understand what the plaintiffs were seeking. These observations find support in the following language of this court, taken from the opinion in the case of Milliken v. Commission Co., 202 Mo. 637, l. c. 654, viz.: "An answer or other pleading in a cause, when offered in evidence, should be construed by the court just as deeds or other written instruments are construed. The object to be attained in the construction of a written instrument is to get at the real intention of the parties. [Burress v. Blair, 61 Mo. 133; Koehring v. Muemminghoff, 61 Mo. 403.] Effect should be given to the whole and every part of a written instrument. [Calloway v. Henderson, 130 Mo. l. c. 86.]"

The same rule of construction applies equally well to a petition filed in a cause. It is the duty of the court in construing any pleading to scan it from its four corners, and if by so doing it appears that a good cause of action or defense is stated therein, then it is not subject to the criticism that it does not state a good cause of action, or a valid defense, as the case may be. We are, therefore, of the opinion that the bill stated a good cause of action for a construction of the will and for the cancellation of the deed of January 14th, 1892.

But independent of the foregoing observations, section 1848, Revised Statutes 1909, provides that: "The court may, at any time before final judgment, in furtherance of justice, and on such terms as may be proper, amend any record, pleading, process, entry, return or other proceedings, by adding or striking out the name of any party, or by correcting a mistake in the name of a party, or a mistake in any other respect, or by inserting other allegations material to the case, or when the amendment does not change substantially the claim or defense, by conforming the pleading or proceeding to the facts proved."

Under the express language of this statute, if the trial court was of the opinion that the bill was defec-

tive in the manner suggested, then clearly it should have permitted the plaintiffs to amend their bill as prayed by them; and having refused to do so it committed error.

II. This brings us to the consideration of the action of the court in refusing to construe the will of Francis Cornet, deceased. This is the primary and basic question presented by this record.

The will not only creates and gives to George Cornet whatever interest or estate he has or had in his father's estate, but it also lies at the very **Will:** **Construction.** foundation of the principles of law and rules of construction which govern the validity of and the construction to be placed upon the deed from George Cornet to Henry L. Cornet, dated January 14th, 1892.

It necessarily follows from the conclusions announced in paragraph one of this opinion, that the court erred in not construing the will of Francis Cornet as prayed by the appellants; but having failed to so do, it devolves upon this court to construe it here.

There are but two paragraphs of the will which challenge our attention, and they are the third and fifth. The former gives, devises and bequeaths all the residue of the testator's property to his "beloved wife and aforenamed children in equal shares, to be divided among them in kind or the same may be sold as they may deem most advantageous or as may be agreed upon by them, and for the purpose of preservation of the property until division is made, I appoint my son, Henry L. Cornet, trustee; he shall take charge of all my real estate except that as described in item 1, until a division is had, he shall account for all income and disbursements for keeping in repair the same and pay over the net proceeds after charging a reasonable compensation for his services, to my said wife and aforenamed children in equal shares quarterly."

The testator by this language, has given to his wife and six children all of his estate, both the real and personal mentioned in this paragraph of the will, in equal parts, that is, each one of them was given an undivided one-seventh of said estate without any words of limitation whatever, as to the character or duration thereof, save and except his son Henry L. Cornet was made trustee of all of said lands, for the purpose of preservation, etc., until a division of them could be made among the devisees in kind, or in such other manner as they might agree upon.

This paragraph of the will gave to the wife of the testator and to each of his six children one undivided one-seventh of said estate in fee simple. [See Sec. 579, R. S. 1909, which is the same as Sec. 4646, R. S. 1899, and Sec. 8912, R. S. 1899.]

If there was no other additional language contained in the will than that found in the third paragraph, and before quoted, there could be no room for controversy as to the character of the estate devised to George Cornet. The language there used gives to him a fee simple estate in and to an undivided one-seventh of said estate, as clearly as it gives to the widow and each of the other children a fee simple estate in and to their respective shares thereof, which is not questioned. This is true for the simple reason that the same language of the will which gives to them their interest in the estate, also gives to George his interest therein.

We do not understand counsel for respondents to deny the correctness of the proposition last stated, but their contention, if we correctly understand them, is, that paragraph five of the will must be read with and construed together with said paragraph three, and that when so read and construed, it destroys George's fee simple estate in and to said property, and creates in his behalf a spendthrift trust, that is, his entire fee simple estate which was given to him by paragraph three of the will was destroyed by paragraph five

thereof, and that the latter gave to Henry L. Cornet said one-seventh of said estate in trust, for the purpose of managing, controlling and collecting the issues, rents and profits thereof, which, less the expenses and compensation for the services of trustee, were given to George for life and after his death the trust will cease, and that said one-seventh of said property will go to the heirs of George, whoever they may be.

The language of paragraph five, which it is contended destroyed the fee simple estate given to George by paragraph three of the will, is as follows:

"The share going to my said son, George A. Cornet, be it real or personal property, shall be placed in the hands of my said son Henry L. Cornet, in trust for the benefit of said George A. Cornet, he, the said Henry L. Cornet, as such trustee, to manage such trust fund, and to make the same productive in such manner as he may deem most safe and advantageous, and the income thereof, after deducting the necessary expenses and a reasonable compensation for his services to either pay over to the said George A. Cornet in quarterly installments, or at his, said trustee's, option, to lay it out in such manner as he deem most beneficial to said George A. Cornet—and after the decease of George A. Cornet, said trust fund shall go to his heirs in law and thereupon the trust shall cease—my son Henry L. Cornet shall not be required to give security for the faithful execution of the trust."

The question now presented, is, does the language just quoted have the effect of entirely destroying the fee simple estate given to George by paragraph three, and invest it in Henry as trustee, for the purpose of collecting the rents and profits thereof and paying the net proceeds thereof to George, as he, Henry, may deem best?

It is elementary that in construing a will the intention of the testator should never be lost sight of, and that intention should be gathered from a reading

of the entire will in the light of the circumstances surrounding him at the time of its execution.   It is also a fundamental rule of construction, that a will, like all other written instruments, should be so construed as to give, if possible, full force and effect to each and all paragraphs thereof.  [Armor v. Frey, 226 Mo. 646.]

In the light of these fundamental rules of construction let us inquire, first, what was the intention of the testator, as gathered from a reading of the entire will; and, second, can the will be so construed as to give full force and effect to all of its provisions?

The record in this case shows that the testator, at the time of making and publishing his will was about seventy  years of age, of sound mind, ripe judgment and possessed fine business qualifications; that he had  a devoted wife and six bright, loving children, all upon the best of terms, and constituted an intelligent, happy family.   There is not a breath of evidence that tends to show that there was any malice, ill-will or bad feeling existing between any of them.

**In Light of Circumstances.**

There was nothing,  at that time,  to mar the pleasure and happiness of that loving family, except the besetting sin of George, before mentioned.   He was a travelling man, and when not drinking  he was a man of ordinary good sense, and possessed ordinary business ability; but frequently he would go on sprees, which would last sometimes for days and at others for weeks, which greatly weakened and depleted his physical and mental condition; so much so that frequently he would have to be sent, or he would go, to some hospital for treatment, and while in that condition would spend and squander his money and property improvidently.

It was under these conditions that the testator made his will, disposing of his estate to his wife and children, all of whom he loved equally well, and by the

third paragraph thereof he gave them equal shares in his estate, as previously stated.

This equal division of his estate among his wife and children is indicative of a just mind and of a sensibility of the testator's duty to make equal provision for those who were the natural objects of his bounty. If the will had stopped there, it would have suggested to the ordinary mind that the testator was not so solicitous of the further welfare and happiness of his son George, as if it had gone further and made some suitable provision for the protection of his heritage against his own improvidence. But seeing George and knowing his besetting sin as well, if not better, than anyone else, evidently moved by his love and anxiety for his son's future, he did not stop short of what ordinary prudence and foresight would have dictated, but he went further, in so far as George was concerned, after making him an equal devisee with his mother and brothers and sisters, and placed his share of the estate in the hands of his brother, Henry, as trustee, who had shown himself to be a good business man and a man of affairs, for the use and benefit of George, with power and authority on the part of Henry to manage and control said trust estate in such manner as he might deem best to make them safe and productive, with directions to pay the income thereof, after deducting the necessary expenses of the trust, together with reasonable compensation to himself for his services as such trustee, over to George A. Cornet, in quarterly installments, or at his, said trustee's, option, to invest it in such manner as he might deem most beneficial to George, and that after the death of George, said trust estate should go to his heirs at law, and thereupon the trust should cease.

From these considerations, it seems perfectly clear from reading the entire will, that it was the intention of the testator to make all of his children equal beneficiaries in the estate, but recognizing the weakness of his son George, he placed his share of the estate in the

hands of a trustee to manage and control, with directions to pay over the net income to him for life, and upon his death the trust should cease and George's interest therein should go to his heirs at law.

This contention not only gives full force and effect to the intention of the testator, as gathered from reading the entire will, but it also conforms to the rule which requires that such a construction shall be given as will give full force and effect to each and every part and paragraph of the will.

But if we construe the will as counsel for respondents contend, namely, that the fifth clause thereof destroys the entire estate given to George by the third clause thereof, and creates in favor of George Cornet, in lieu thereof, only a spendthrift trust, **Elimination of One Clause.** then we would, by such construction, eliminate therefrom practically all of paragraph three of the will, in so far as it relates to George's interest, which gives him, as previously shown, an unqualified fee in and to an undivided one-seventh of his father's estate.

Such a construction would also do great violence to much of the language of paragraph five of the will.

But preliminary to this, it should be borne in mind that said paragraph three not only gave George A. Cornet an undivided one-seventh of his father's estate in fee simple, but it also in plain and unambiguous language gave the devisees, all of them, not part of them, the right to divide the estate "in kind" or to sell the same "as they may deem most advantageous, or as may be agreed upon by them."

What sense would there be in that language, if George took no interest whatever in the corpus of the estate? I submit, none whatever, for the reason that he then had no interest in the estate about which he could agree, or which he could accept in kind if divided between them. It has no tendency whatever to support the idea that the testator intended to create a spend-

thrift trust in George's favor, but it strongly confirms the previously expressed wish of the tesator that George and the widow and all of his other children should take a fee in his estate.

But let us return to the fifth paragraph of the will, and see what violence would be done to the language thereof, if respondent's contention is true.

The very first sentence thereof reads, "The share going to my said son George A. Cornet, be it real or personal property, shall be placed in the hands of my said son Henry L. Cornet, in trust for the benefit of George A. Cornet," etc.

Now what share of the testator's estate was "going to my [his] son George A. Cornet?" Clearly the fee simple estate given to him by paragraph three of the will, for the simple reason that he is given no interest therein by any other language of the will.

Moreover, if the will only created a spendthrift trust in favor of George, and gave him no interest whatever in the corpus of the estate, as contended for by respondents, then why did the testator provide in the will that George's share "shall be placed in the hands of my [his] son Henry L. Cornet, in trust for the benefit of said George A. Cornet," etc.?

This language clearly recognizes the fact that the testator had previously given George an interest in his estate, and that he wanted it placed in the hands of Henry L. Cornet, as trustee for the use and benefit of George, whom he was afraid would squander and waste it if left in his own hands.

Again said paragraph five of the will provides that Henry L. Cornet, the trustee, shall "manage such trust fund, and make the same productive," and pay the net "income thereof" to George A. Cornet. The language expresses a continuation of the idea that the testator had given to his son George an undivided one-seventh interest in his estate in fee, and that he had previously placed that interest in the hands of Henry

L. Cornet, as trustee, for the use and benefit of George, with directions to manage and control the same, and to pay the net "income thereof" quarterly, over to George.

So far every word and line contained in the will clearly states the intention of the testator to give George a fee simple title in and to an undivided one-seventh of his estate, and that Henry L. Cornet was to hold it as trustee for the use and benefit of George and pay over to him quarterly the net "income thereof." And so far there is not a word to the contrary.

But we now come to that part of paragraph five which counsel for respondents contend entirely destroys the entire estate in fee given to George by paragraph three, and divests out of him every vestige of interest in and to the corpus of the estate devised to him; and converts that interest into a spendthrift trust, in favor of George for life only. The language of that part of said paragraph five relied upon by counsel for respondents as having destroyed George's fee simple title to his share of their father's estate will be here stated. The will, after requiring Henry L. Cornet, the trustee, to pay the net income of George's share of the estate to him quarterly, as previously stated, gave the trustee the right to suspend those payments if he saw proper, and in lieu thereof, gave him the option and authority to invest the rents in other property, in the following language: "To pay over to said George A. Cornet in quarterly installments, or at his, said trustee's option, to lay it out in such manner as he may deem most beneficial to said George A. Cornet,—and after the decease of George A. Cornet, said trust fund shall go to his heirs in law and thereupon the trust shall cease."

Now, if it be true that George had no interest whatever, present or future, in the corpus of the estate, but was given only a spendthrift's right to the net rents and income thereof, during life, then by what process

of sound reason can it be contended that it could or would be to the *best interest* of George A. Cornet, as provided by the will, to withhold those rents from him and to reinvest them in other property which could never go to him, nor the rents of which would never go to him, unless Henry from the fullness of his heart deemed it best to give them to him. This construction of the will would totally disinherit George and make his interest in his father's estate depend entirely upon the naked power of Henry, the trustee, to give or withhold from him any or all the rents and income of the estate, as he might deem best. Clearly that was not the intention of the testator, but what was his intention remains to be seen.

We must confess that the language quoted is not as clear as it might be, and if construed alone some doubt might arise as to the meaning of the testator; but we have no legal right to construe this language as though it was stating an independent proposition. We must construe it in connection with and in the light of all the provisions of the will, because the language itself in express terms refers to the estate given to George by the paragraph three and in the first part of paragraph five.

That being true, we must not lose sight of the fact that the testator intended to and did make all of his children equal under the will, and that each and all of them were given a fee simple title in and to his estate, George's interest therein differing not a whit from the interest of the others save and except in that it was placed in the hands of a trustee for the purpose of managing the corpus, collecting the rents and paying the net income thereof to George. Now, if we consider the foregoing facts in connection with the words "and after the decease of George A. Cornet, said trust fund shall go to his heirs in law and thereafter the trust shall cease," quite a different meaning would be expressed thereby, from what would be expressed if

they stood alone.  If standing alone, they might fairly
be construed to mean that George A. Cornet was given
only an equitable estate for life in his undivided one-
seventh share of the estate (not a spendthrift trust),
and that upon his death the trust should cease, and the
remainder would pass under the will to his heirs at
law.  But if those words are read in connection with
the fact that the other provisions of the will, in clear
and unmistakable language gave George an equitable
estate in fee in said share of his father's estate, then
it is clear in our minds that the testator never in-
tended, by the words last quoted, to destroy the estate
in fee, given to George by paragraph three and to con-
vert it into a spendthrift trust for life only, but that it
was the testator's intention, at all times, that George
and his other children should share and share alike
and have, as the other children have, a fee in an undi-
vided one-seventh part of the estate, differing from
theirs only in the fact that his was to be held in trust
by Henry L. Cornet, as trustee, for the use and benefit
of him during his life.  And the testator having given
George an estate in fee, well knew that upon his death
it would go to his heirs at law under the statutes of
descent and distribution, but wishing to have the trust
feature of the will terminate with the death of George
(because no longer necessary), the testator provided
in the will that upon the death of George the  trust
should cease, and having in mind the fact that upon
the death of George, the estate in fee, given to him in
the first instance, would descend to his heirs at law,
just as the estates of his other children would descend
to their heirs, he evidently attempted to confirm that
idea by stating that upon the death of George the es-
tate should go to his heirs at law, as previously pro-
vided, not under the will, but under the statutes of
descent and distribution.  That would have been true,
even though the will had not contained the words, that

"after the death of George said trust fund shall go to his heirs in law."

That being true, then it cannot be reasonably contended or held that the testator intended for those words to perform the two-fold function of destroying the estate in fee previously created by other clear and appropriate language, contained in paragraphs of the will, and at the same time create a spendthrift trust for life in George, and at his death the whole estate to pass or go to his heirs at law. No such idea, in our opinion, ever entered the mind of the testator, at least there is nothing contained in this record tending to show that fact.

That was clearly the intention of the testator, for it is in harmony and in keeping with the whole tune and meaning of the will. It was also his intention regarding the estates given to his other children.

Not only that, but as before stated, there is not a word in the will which even remotely indicates that the testator wished or intended to cut down the estate in fee given to George by paragraph three of the will to a mere life estate, or to create a spendthrift trust; nor is there any fact or circumstance shown by the evidence which tends to prove that the testator had any cause or excuse for giving George a smaller estate than he gave to his other children.

By this construction each and all of the terms of the will are given full force and effect, but any other construction would practically nullify all of paragraph three and the greater portion of paragraph five of the will, in so far as they relate to the estate given to George A. Cornet, and make his interest therein depend entirely upon the will of Henry.

The construction we have placed upon the will is fully supported by many adjudications in this court, **Subsequent Ambiguous Clauses.** and it might be truthfully said that it is a settled rule of property in this State, that when the words of a will at the beginning

clearly show that it was the intention of the testator to devise the entire estate absolutely to the first donee, then that estate will not be cut down to a less estate by subsequent ambiguous words found therein.

The fourth paragraph of the syllabus of the case of Gannon v. Albright, 183 Mo. 238, clearly stated that rule of law in these words: "Where the words of a will at the outset clearly indicate a disposition by the testator to give the entire estate absolutely to the first donee, the estate will not be cut down to a less estate by subsequent or ambiguous words inferential in their intent."

The same rule is emphasized and re-announced in the case of Gannon v. Pauk, 200 Mo. 75.

And GRAVES, J., in the recent case of Sevier v. Woodson, 205 Mo. 202, l. c. 214, recognized and stated the same rule in this language: "We take it to be well-settled law that where a certain estate is granted in plain and unequivocal language in one clause of a will, the same cannot be lessened or cut down by a subsequent clause of the will, unless the language used in such subsequent clause is as clear, plain and unequivocal as the language of the first grant," or that when from reading the entire will from cover to cover, a contrary intention is as clearly expressed by the testator.

The same rule is recognized by LAMM, J., in the case of McCune v. Goodwillie, 204 Mo. 306, l. c. 337, and restated and fully confirmed in the following cases: Settle v. Shafer, 229 Mo. 561; Jackson v. Littell, 213 Mo. 589; Armor v. Frey, 226 Mo. 646, l. c. 687. There are many other cases to the same effect, too numerous to mention. [See Citator (Missouri Ed. 1911), p. 740.]

This rule perfectly fits and fully controls the will in this case. The language here, in the first instance, in clear and unambiguous terms, gives to George A.

Cornet an absolute fee simple estate in and to an undivided one-seventh of the testator's estate, and there is no other clearly expressed intention of the testator to cut down or reduce or change that estate to a smaller one, much less to destroy it entirely and create instead thereof a spendthrift trust in favor of George, as is earnestly contended for by learned counsel for the respondents.

We are, therefore, of the opinion that it was the intention of the testator to give to his son George A. Cornet a fee simple title in and to an undivided one-seventh of his estate, in trust, however during his life, and after his death, to descend to his heirs at law. [Guy v. Mayes, 235 Mo. 390; Settle v. Shafer, 229 Mo. 561; Jackson v. Littell, 213 Mo. 589; Sevier v. Woodson, 205 Mo. 202; Gannon v. Albright, 183 Mo. 238; Gannon v. Pauk, 200 Mo. 75; Roberts v. Crume, 173 Mo. 572; Roth v. Rauschenbusch, 173 Mo. 582; Yocum v. Siler, 160 Mo. 281; Nichols v. Boswell, 103 Mo. 151; Small v. Field, 102 Mo. 104; Chew v. Keller, 100 Mo. 362.]

III. This brings us to the consideration of the question: should the deed of George A. Cornet to Henry L. Cornet, trustee, dated January 14, 1892, be set aside, and for naught held?

In the statement of this case, but little of the evidence bearing upon this branch of it, is set out, for the reason that the facts thereof are practically undisputed, either by the pleading or the evidence.

Briefly the evidence shows that Francis Cornet, on and prior to January 20, 1891, the date of his death, was a resident of the city of St. Louis, the head of a family which consisted of his wife and six children, and owned and possessed real and personal property worth about $240,000. The family was a happy one, and all the children were past the age of majority, and all of them were bright and intelligent

persons, and there existed but one fact which cast. a shadow of apprehension or gloom across their path-way of life, and that fact was the intemperance of George. Occasionally, and too frequently for his mental, physical and financial good, he would go on "sprees" as some of the witnesses stated, while others used other words of equivocal import. George was a travelling man, and while sober, worked steadily and was an ordinarily good business man, but when intoxicated he was wholly incapacitated to transact business. Those sprees varied as to frequency, duration and intensity. Generally, while under the influence of liquor, George would go or would be taken to the Mullanphy or St. Vincent's Hospital for treatment. Those sprees would leave him in a weakened and depleted state, both physically and mentally, and during their continuation he would waste or foolishly expend his money and means for intoxicants and for other useless purposes. But in the language of Henry, the trustee and one of the respondents, "when he [George] got over a spree, he resumed work and worked steadily." At that time George was unmarried, but for many years prior thereto, with the knowledge of the testator, he had been going with and paying court to Tillie Klock, whom he subsequently married, and who is his co-appellant here.

It was under those facts and circumstances, as previously stated, that Francis Cornet made and published the will under consideration.

The uncontradicted evidence is that upon the death of his father, December 20, 1891, George, with his uncle, got upon a spree. They visited many saloons in north St. Louis, and in order, I presume, to drown his sorrow, he and his uncle drank liquor in all of them. In an intoxicated state, about Christmas day, George was taken to St. Vincent's Hospital for treatment, where he remained under treatment until January 14, 1892, something over two weeks, when he went to his

brother Henry's office where he executed the deed in question. He went to the office in a very much weakened and depleted condition in both mind and body, for the purpose of drawing some money. While there, Henry, his brother, and trustee under the will handed him, George, the deed of January 14, 1892, and requested him to sign it, and stated to him that "it was a mere matter of form." George did not know the contents of the deed nor did he read it prior to its execution. He simply asked his brother Henry, "What is it?" to which Henry replied, "It is a mere matter of form, so that you cannot borrow money on your income." Whereupon George said: "If that is it, I will" (sign it), and he did then and there, without knowledge of its contents, or the advice of counsel, sign the deed, upon the statement of his brother, the executor, and trustee, to the effect that it was a mere matter of form intended to prevent him from borrowing money upon his income.

It is also uncontradicted that Henry was unusually bright and intelligent, and was a good business man, that he had consulted able counsel as to the construction to be placed upon the will of Francis Cornet, especially as to the kind and character of the estate given to George A. Cornet; that in the light of the opinion of said counsel as to the meaning of the will of Francis Cornet, Henry Cornet, the executor of the will, and trustee of George's estate, had the deed in controversy prepared by the same learned counsel; that Henry was a full brother of George and was, as previously stated, the executor of the estate, and trustee of George's estate under the will of their father, and that George had full confidence in the honesty, integrity and truthfulness of Henry and recognized in him his well known business ability and knowledge of business transactions generally.

The foregoing facts and conditions stated were

those that existed and surrounded George A. Cornet at the time he executed the deed in controversy, and which he asks to be set aside and cancelled.

But preliminary to the consideration of that question much light will be shed upon the situation by first examining the deed and ascertaining where in it differs from the will before construed.

Preliminary to the consideration of that question, it may be well to state that counsel for respondents insist that there is no material difference between the legal effect of the will and the deed of January 14th, 1892. That is, they contend that each of them created and vested in the appellant, George A. Cornet, a spendthrift trust, differing only in this, that the deed goes one step further than the will and prohibits George from alienating or anticipating the rents, issues and profits of the estate devised to Henry, trustee, for the use and benefit of the former, while the will is silent upon that matter. It is further insisted by said counsel that, apprehending George might, while on one of his drunken sprees, alienate, convey, anticipate or dispose of whatever interest he may have acquired in the estate under and by virtue of the will, and that in order to more clearly express the intention of the testator regarding the character of the interest or estate devised to George, and to prevent said alienation or anticipation, the deed in question was drawn by Henry and executed by George.

In so far as here pertinent, the material parts of said deed are as follows:

"That in consideration of the sum of one dollar to him, paid . . . as well as in consideration of the uses and trusts hereinafter specifically set forth, the said party of the first part has granted, sold, conveyed and transferred and hereby does grant, sell, convey and transfer unto the second party all right, title and interest of said party of the first part in and to all the lands, tenements and hereditaments of Francis Cornet late-

ly deceased, . . whether such right, title or interest
be present or in expectancy or reversion, as well as all
other estate or property whether personal or mixed,
of the said party of the first part, derived from or to
which he may be entitled under the last will of said
Francis Cornet, deceased, and all increase, interest or
accumulations thereof. To have and to hold the same
unto the said Henry L. Cornet, his heirs and legal
representatives or successors in trust forever. In
trust however for the uses and purposes following,
to-wit:

"Whereas in and by the last will and testament
of Francis Cornet, deceased, duly probated in said city
of St. Louis, it was intended that all the property
aforesaid should pass to and be held by the party of the
second part herein in trust for the beneficial use of
the party of the second part without power of aliena-
tion or anticipation in the party of the first part for
and during his natural life, with remainder over to his
heirs at law, and so that the said party of the first
part shall be without power to alienate any of said
property or to anticipate, charge or convey the rents,
incomes or profits thereof.

"Now, therefore, in order to fully carry out and
give effect to the purposes and intention of Francis
Cornet, deceased, as in and by said will indicated and
for the purpose of fully and effectually defining and
declaring the trust, so by said testator created, and by
the parties hereto accepted, it is hereby covenanted as
follows, to-wit: That the party of the second part
shall fully take charge of, hold, manage and control any
and all the estate, property or interest, whether real
or personal, that may now be or compose the share of
said George A. Cornet in the estate of said Francis
Cornet, deceased, or that may hereafter become such
either by descent, reversion or otherwise; that the
said party of the second part shall collect and receive
all rents, incomes and profits at any time or in any man-

ner arising therefrom, and out of the same shall first pay and discharge all proper charges or expenses upon any part of the share of said estate, including usual compensation to him as such trustee, and the net balance of said income or profits he shall pay over to the party of the first part in quarterly installments or at such times and in such amounts as to him may seem most beneficial to the party of the first part for and during the natural life of the said party of the first part, without power, however, in said party of the first part to in any manner alienate, dispose of, anticipate or charge either the principal or any part of the income of said property, in any manner whatsoever, and upon the death of said party of the first part the trust hereby defined and imposed shall cease, and the property aforesaid shall by said party of the second part or his successors in trust be equally divided among the heirs at law of said party of the first part *per stirpes,* and the said party of the second part and his successors in trust are hereby authorized to sell, alienate and convey any part of the property and estate hereby conveyed and to make full and perfect title or delivery thereof to the purchaser on such terms and at such prices as to him shall appear proper, and the proceeds of any such sale or transfer he shall again invest in good real estate or bonded securities to be held, controlled and managed in the same manner and upon the same power and trusts herein prescribed with reference to the original estate, and the said party of the first part expressly releases and waives all rights under and by virtue of the homestead exemptions,'' etc.

In our opinion this contention of learned counsel is based upon an erroneous conception of both the will and the deed.

We have heretofore, in paragraph two of this opinion, considered and determined the nature and character of the estate devised to George by the will, and it would serve no useful purpose to restate, here, the

conclusions there reached. We will, therefore, confine this branch of the inquiry to the character of the interest or estate conveyed, declared or retained (whichever you may choose to call it) to or in George by the deed of January 14, 1892.

The following provisions in effect are contained in said deed which were not contained in the will, namely:

(a) An absolute conveyance of the corpus of the estate acquired by George under the will, to Henry, as trustee, during the life of George, and the remainder after his death to his heirs at law, without power of alienation.

(b) A declaration or creation of a trust as to the issues, rents and profits growing out of or arising from said estate, for the use and benefit of George for life, without authority of alienation or anticipation on his part.

(c) That upon the death of George the trust is to cease and both the legal and equitable title and interest in and to said estate is to go under the deed to the heirs at law of George *per stirpes*.

(d) The trustee, by the deed, is authorized and empowered to sell and convey any or all of the interest or estate given to George by the will, and to reinvest the proceeds thereof in real estate or bonded securities, to be held, controlled and managed in the same manner and upon the same powers, trusts and uses as is therein prescribed with reference to the original estate.

(e) A conveyance to the trustee of all other interest or estate that George might in the future acquire by *descent, reversion or otherwise* in or to the estate of the testator.

(f) George also, by said deed, released and waived all homestead rights and exemptions which he then had or might in the future acquire in or to his father's estate.

The other provisions of the deed, which are few in number and formal in character, are substantially the same as those contained in the will.

By this analysis of the deed and a comparison of it with the will, it will be seen at a glance that George, without consideration, has conveyed all the fee simple estate given to him by his father's will, as well as all he might hereafter acquire therein by *descent, reversion or otherwise,* to Henry as trustee, for the purposes before mentioned. In other words, he has by that deed absolutely divested and stripped himself without consideration, of all his right, title and interest, *present and future,* in and to his father's estate, valued at $135,000, his interest at the time of the trial being about $35,000.

Or according to the contention of counsel for respondents, George executed the deed in question in consideration of the spendthrift trust declared and created in his favor by said deed.

That is unquestionably true, but he reserved that interest out of the fee given to him by the will. It was not conveyed to or given to him by the trustee, or by anyone else claiming under the deed.

Under the will George owned a fee in the corpus of the estate, as previously stated, as well as the net issues, rents and profits thereof, all of which he could have anticipated and disposed of by deed or other appropriate instrument. Recognizing these facts, and taking advantage of the confidential relation existing between them, Henry, by misrepresentation as

Acts of Fraud.

to the character of the estate George took under the will and as to the purpose of the deed, procured its execution on January 14, 1892, while George was in a weakened and depleted condition, both physically and mentally, he having just come from under the influence of intoxicating liquors, which he had been indulging in to an excess for more than two weeks immediately prior to the execution of the deed.

George, by said deed, for a "mess of pottage" not only disposed of his then present interest in his father's estate, but also thereby sold as did Esau of old his birthright to his father's estate, and thereby pauperized himself for the present and for all time to come, leaving him nothing but the spendthrift trust before mentioned.

These facts present the legal proposition we are called upon to determine under this branch of the case, namely; will equity grant relief to George and his wife under the facts and circumstances stated?

Counsel for appellants answer that question in the affirmative, while counsel for the respondents answer it in the negative.

Counsel for appellant insist that it would be unconscionable and inequitable to permit such a transaction to stand, and that the mere statement of the proposition itself calls forth equitable condemnation; while upon the other hand, counsel for respondents earnestly insist that the relief prayed for should be denied, because, as they contend, the evidence fails to show that Henry L. Cornet or any other one of the respondents fraudulently procured the execution of the deed of January 14, 1892.

Concede for the moment, without deciding the question, that the evidence fails to show that Henry L. Cornet through fraud or undue influence procured the execution of the deed of January 14, 1892, would that fact justify a court of equity in withholding the relief asked?

Counsel for appellants insist no, for the reason assigned, that the evidence shows that said deed is greatly to the detriment and disadvantage of George the grantor, and highly beneficial and profitable to Henry the grantee, who the uncontradicted evidence shows was a full brother of George, and the executor of the will under which the latter derived his estate and the trustee of the estate devised to him by said

will; also that George was in a weak and depleted condition, both physically and mentally, at the time of the execution of the deed, and that Henry entertained the full confidence and respect of George, and that the intimate and confidential relation that existed between them as trustee and *cestui que trust* gave Henry an undue influence over the mind of George.

Upon that showing, counsel for appellants insist that the burden was cast upon the respondents to show by clear, positive and the most convincing evidence, that the deed was the free and voluntary act of George, and that Henry practiced no fraud upon him, and exercised no undue influence over his mind at the time of the execution of the deed. It is not pretended by counsel for respondents that they undertook this laboring oar, and showed affirmatively that Henry was not guilty of fraud and undue influence; but upon the contrary they rested their case largely upon the showing made by appellants.

There is no principle of law better settled in this State than the one which indulges the presumption that undue influence has been used where a **Confidential** patient makes a will or executes a deed in **Relation:** favor of his physician, a client in favor of **Undue** **Influence:** his lawyer, a *cestui que trust* in favor of **Presumption.** his trustee, a ward in favor of his guardian, a principal in favor of his agent, any person in favor of his priest or other religious advisor, or where any other close confidential or fiduciary relation exists between them.

In discussing this rule, this court in the case of Barkley v. Cemetery Assn., 153 Mo. 300, l. c. 315, used this language: ''This rule has for its basis some pecuniary benefit to be derived directly or indirectly under the will by the person or church or charity represented by the person by whose influence the testator is influenced to make the will, and the cases chiefly relied upon by plaintiffs, namely, Garvin v. Williams, 44 Mo. 465;

Harvey v. Sullens, 46 Mo. 147; Cadwallader v. West, 48 Mo. 502; Garvin v. Williams, 50 Mo. 206; Street v. Goss, 62 Mo. 226; Bradshaw v. Yates, 67 Mo. 228; Bridwell v. Swank, 84 Mo. 455; Gay v. Gillilan, 92 Mo. 250; Maddox v. Maddox, 114 Mo. 35; Carl v. Gabel, 120 Mo. 283, are of that character.''

And in Ryan v. Ryan, 174 Mo. 279, l. c. 286, this court in speaking through VALLIANT, J., said: ''Learned writers on this subject while frequently specifying the relations of physician and patient, priest and communicant, lawyer and client, as examples of what the law deems a fiduciary relation, have been careful not to narrow the class so as to exclude other relations that ought to be embraced in it. [Cadwallader v. West, 48 Mo. 483.] The text-writer in 13 Am. & Eng. Ency. Law, (2 Ed.), page 11, says: 'A person is said to stand in a fiduciary relation to another when he has rights and powers which he is bound to exercise for the benefit of that other person.' ''

And VALLIANT, J., in the case of Studybaker v. Cofield, 159 Mo. 596, l. c. 612, in speaking of the burden of proof in such cases, said: ''Upon whom is the burden of proof? Plaintiffs insist that a fiduciary relation existed between Mrs. Cofield and her uncle, and the deed having been executed while that relation existed, the presumption arises that it was the result of undue influence, and the burden is upon her to show that such was not the case. In support of the proposition that such presumption arises when such relation exists, and that the burden of proof shifts to the defendant when the plaintiffs' proof establishes that relation, a large number of cases are cited from our reports, and the proposition is fully sustained. [Garvin v. Williams, 44 Mo. 465; Cadwallader v. West, 48 Mo. 483; McClure v. Lewis, 72 Mo. 314; Martin v. Baker, 135 Mo. 495; Dingman v. Romine, 141 Mo. 466.]''

In Martin v. Baker, 135 Mo. 495, l. c. 503, this court said: ''But in an inquiry whether the execution of

the deeds was the free and voluntary act of the grantor, or was the result of improper influence of the defendants, the character of the transaction, the physical and mental weakness of the grantor and the relationship of the parties to each other cannot be ignored. Indeed 'wherever two persons stand in such a relation as that, while it continues, confidence is necessarily reposed by one, and the influence which naturally grows out of that confidence is possessed by the other, and this confidence is abused, or the influence is exerted to obtain an advantage at the expense of the confiding party, the person so availing himself of the position will not be permitted to retain the advantage, although the transaction could not have been impeached if no confidential relation existed.' [2 White and Tudor's Leading Cases in Eq., page 1156. See, also, Hamilton v. Armstrong, 120 Mo. 615; Cadwallader v. West, 48 Mo. 496.]''

And Commissioner MARTIN in the case of Bridwell v. Swank, 84 Mo. 455, l. c. 467, said: ''To decide upon the character of this instruction it is only necessary to recall certain propositions of law which have been settled after thorough and repeated examinations. A devise by a ward to or for the benefit of his guardian, in any proceeding to establish or contest the same, is presumed in law to have been procured by the undue influence of the guardian, and the burden of repelling this presumption and thereby establishing or maintaining the devise rests upon those seeking to derive advantage from it. [Garvin's Adm'r v. Williams, 44 Mo. 465; Garvin's Adm'r v. Williams, 50 Mo. 206.] If the fiduciary relation of guardian and ward existed at the time of the execution of the gift or devise, and the parties were so situated with reference to each other that undue influence could have been used, the law presumes that it was used, and those seeking to derive advantage from it must rebut the presumption by competent and convincing proof. This presumption rests upon three facts for its formation: First, the fiduciary re-

lation; second, the gift or devise to, or in the interest of, the guardian; third, an opportunity for an exercise of undue influence.'' [See also Cadwallader v. West, 48 Mo. 483; Caspari v. First Church, 82 Mo. 649.]

If we apply this rule of law to the facts of this case, it will be seen that it fits them as perfectly as a glove fits the hand, and consequently we must rule that under the showing made by appellants, the law presumes that the respondents procured the execution of the deed in controversy through fraud perpetrated upon and undue influence exercised over the mind of the appellant, George A. Cornet; and respondents having wholly failed to overcome or disprove that presumption, we must hold the deed to be null and void and of no force or effect.

But this case need not rest upon this presumption of fraud, for we are of the opinion that this record shows sufficient actual fraud to warrant a court of equity in setting the deed aside.

In the first place, it should be borne in mind that George was weak physically and mentally, the result of excessive drink, which fact gave birth to **Acts of Fraud.** that provision of the will which placed his share of the estate in the hands of a trustee; also that at the very time of the execution of the deed he had just emerged from St. Vincent's Hospital, where he had been confined for more than two weeks on a prolonged spree, and according to his testimony he was very much weakened and debilitated, both physically and mentally; and according to the testimony of Henry, he was wholly incapacitated for business while in that condition, and for that reason he said he wanted the deed in question executed.

Not only that, but without the knowledge or consent of George, Henry had previously consulted a lawyer as to the meaning of the will, and having ascertained that it was not just in keeping with his ideas as to the kind of an estate his father should have given

to George, he had the deed in question drawn, and ready for execution when George called at his office to draw some money from his estate. He also knew George had no knowledge of the contents of the will, except probably a short family discussion of it a few days after his father's death. He also knew that George had no knowledge of the existence or of the contents of the deed prior to the time he executed it; and that he had no opportunity to consult counsel about the deed prior to its execution.

In addition to all this, Henry misrepresented to George that the only purpose he had in wanting the deed executed was to place the latter's interest in the estate in a position where he could not anticipate, alienate or dispose of the same while he was drinking. He not only did that, but in furtherance of his fraudulent design to acquire the whole of this splendid estate, he also knowingly had the deed of January 14, 1892, so drawn as to convey to him, Henry, all further interest George might by descent, reversion or otherwise acquire in his father's estate, and in keeping with that idea and for the purpose of obtaining title to said further acquired interests, Henry always appeared upon the scene when any one of his brothers or sisters died, with a deed or some instrument drawn, conveying to him, as trustee, all the right, title and interest he, George, had inherited from said deceased brother or sister.

On November 11, 1893, by a deed duly executed George conveyed to Henry, as trustee, all the interest he inherited from his sister Ida; and on March 22, 1900, by another instrument duly executed, George conveyed to Henry, as trustee, all interest inherited from his brother William.

The terms of the trust, as stated in each of the instruments last mentioned, are the same as those stated in the deed of January 14, 1892, from George to Henry, neither of which gives George any interest

in or to the corpus of those two estates; at most his interest therein is only that of a spendthrift trust.

In all probability, as appears from the facts disclosed by this record, it will be but a short time until Henry will be practically the owner of this entire estate. Especially will that be true, if as the present indications point, he will survive his brothers and sisters. But under this deed and those instruments, George could never acquire any interest in said estate, even though he should survive all of them. This whole scheme of Henry's is contrary to the plain letter and meaning of the will, and contrary to his father's ideas of right and justice as expressed in his will, and disclosed by the record in this case.

If the deed of January 14, 1892, and those dated November 11, 1893, and March 11, 1900, executed in pursuance to and in furtherance of the fraudulent designs concocted by Henry to acquire all of this estate, are to stand, then the will of Francis Cornet will be nullified and set aside by the very executor and trustee (in whom he had absolute confidence) he selected to carry out and execute the same.

No court of equity should hesitate one moment to place its stamp of disapproval upon such bare-faced fraud and gross breach of trust as this record shows Henry L. Cornet is guilty of.

We are, therefore, of the opinion that the deed of January 14, 1892, should be set aside, cancelled and for naught held, and it is so ordered.

There are many other minor questions presented and discussed by counsel for both parties, but they do not go to the merits of the case, and whatever disposition might be made of them would not change the result reached by us.

We are, therefore, of the opinion, as before stated, that George A. Cornet, the appellant, under his father's will took an equitable fee simple estate in and to the property therein devised and bequeathed to him.

Also that the deed of George A. Cornet to Henry L. Cornet, trustee, dated January 14, 1892, purporting to convey the former's interest in and to the property acquired by him under and by virtue of his father's will, to the latter, was procured by fraud and undue influence, and should for that reason be set aside and for naught held.

We are also of the opinion that Henry L. Cornet should, because of his fraudulent conduct in the premises, be removed as trustee of the property **Removal of Trustee.** entrusted to him by the will of his father, in so far as George A. Cornet is concerned; that the circuit court should appoint some suitable person as trustee, to succeed Henry L. Cornet, to take charge of, execute and administer the trust property devised to George A. Cornet, according to the provisions of the will; that an accounting should be had between him and Henry L. Cornet as such trustee, and thereby ascertain what property, real, personal and mixed, including, namely, stocks, bonds, and all other securities, that have come into his hands as such trustee, belonging to George, as well as all rents, issues and profits thereof which have been collected by him; also that a statement of all the legitimate expenses paid or incurred by Henry as such trustee, on account of said trust property, including reasonable compensation for whatever services he has performed for the estate, under the direction of the will, and that he be allowed credit for the aggregate amount thereof; that he should account for, turn over and pay to his successor in trust, all the remaining property, real, personal and mixed, in his hands, as such trustee, including all money, stocks, bonds and all other securities of every kind and description belonging to George, as well as the rents, issues and profits thereof; that his successor in trust receipt said Henry for all of said property so paid and turned over to him, and file with the clerk of the circuit court a

full and complete inventory of all of the property so paid and turned over to him, which shall be recorded in the records of said court; that said successor in trust shall execute to the State of Missouri to the use of George A. Cornet, his heirs, executors, administrators and assigns, a good and sufficient bond of some solvent indemnity company in double the amount of the value of all the property which may come into his hands as such trustee, to be approved by the circuit court, conditioned that he will truly and faithfully execute and administer said trust estate, according to the terms of the will, and to fully account for and pay over to the rightful owners all of the property remaining in his hands, at the expiration of the trust, or at such other times as the court may order.

The judgment is reversed and cause remanded with directions to proceed as above directed. All concur—*Lamm, J.,* in separate opinion.

## CONCURRING OPINION.

LAMM, J.—On oral argument at this bar I was tentatively of opinion the judgment should be affirmed, but my brother's opinion has altered my views, so that now I concur heartily in so much of it as sets aside the voluntary transfers of plaintiff to his brother Henry. I think the fiduciary relation between them put the burden on Henry Cornet to show those transfers fair and just. This burden he threw off. Neither do the instruments assailed bespeak fairness in their terms or import it on their faces. Defendant trustee was called to and assumed a high and delicate duty. He was his brother's keeper in a noble sense. The deeds smack of personal advantage to the trustee. The office of those transfers was not alone to clarify the terms of the will but to *enlarge* those terms. As the trustee's

**Fiduciary Relation: Burden.**

attitude in act and word is cold and hostile to the beneficiary, it is well that another trustee (a neutral and competent person) be appointed and an accounting be had.

But it has been with no little difficulty that I bring myself to concur in the construction given the will. The intent of testator, to be got at by the terms <span class="margin-note">Meaning of Will.</span> of his will, has been called the pole-star of judicial interpretation. The statute runs the same way. To that, all agree. Figuratively, judges dealing with wills are to stand in the shoes of testator, or, sitting in his armchair, look through his spectacles as near as may be and thereby when the intent is obscure, try to get at it, and give it effect. Wills are favored. The maxim is: It is to the interest of the State that the last wills of its citizens be sustained. (*Interest rei publicae suprema hominum testamenta hata haberi.*) Of course that maxim is merely a cautionary one of use in dealing with an important subject of great tenderness among all enlightened people. There is another rule of interpretation heading to the same end, viz., that an instrument should be so construed that the thing shall stand and not fall. (*Ut res magis valeat quam pereat.*)

Attending to them both a doubt arose, *viz.*, whether, reading the will by all its four corners to get at its illuminating purpose, it could be said to be the intent of testator to give his son (in the grasp at intervals of a tyrannical and uncontrollable vice, subversive of business judgment) the power to give away or alienate his estate, or hypothecate or anticipate his income. Whether the father did not intend to guard against that, and, therefore, whether the construction put upon his will should not do so? Whether if the will is not to be given that construction, it might not as well never have been written; for, at bottom, does it effect anything of substance? Is it to all vital intents not an empty noise, a thundering in the index?

But, on the other hand, can it be surely said the father had lost all hope of his son's reformation? Did he intend to cut him forever off with an income optional with his trustee? Or create an irrevocable spendthrift trust with no title in the *corpus* of the estate? If he did he used unfortunate and inexact language of doubtful import that is not sufficient to cut down the estate granted in a former clause.

I am constrained to concur and do so.